[No. B117298. Second Dist., Div. Four. Jan. 12, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM S. OSKINS, Defendant and Appellant.

**COUNSEL**

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Marc J. Nolan and April L. Sylvester, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**EPSTEIN, J.**—Penal Code section 12020 makes it illegal to possess any of a long list of weapons. (All unlabeled statutory references are to the Penal Code.) Among them is a "dirk or dagger." Subdivision (c)(24) of the statute defines those terms as "a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death." The principal issue in this case is what, if any, mens rea is required for violation of this portion of the statute.

William S. Oskins appeals from his judgment of conviction by jury trial of possession of a dirk or dagger in violation of section 12020, subdivision (a). He argues that his conviction must be reversed because the trial court excluded evidence as to his intent and because the jury was not required to find that he acted with the necessary mens rea. He also argues that section 12020, subdivision (a) is unconstitutionally overbroad if it criminalizes wholly innocent conduct.

We agree with appellant's arguments regarding the mens rea requirements of section 12020, subdivision (a) as amended in 1995. It follows that appellant should have been allowed to present evidence of his intent with respect to the instrument he possessed, and that the jury should have been instructed on the mens rea necessary for a violation of that statute. Since evidence on that issue was excluded and a necessary instruction was refused, we reverse. It is unnecessary to reach appellant's other arguments.

### FACTUAL AND PROCEDURAL SUMMARY

While on patrol at 2 p.m. on July 31, 1997, Los Angeles Police Officer Brien Pogue saw a gray van with the rear license plate obscured by a hinged portion of the left rear door. Officer Pogue stopped the van, which appellant was driving, and ordered appellant and his female passenger to exit. During a patdown search, Officer Pogue located a knife in appellant's rear pants pocket. It had a two-and-one-half-inch stainless steel blade, sharpened on one side, with serrations on a portion of the other side and a handguard. The blade was wrapped in cardboard and packaging tape.

Appellant was arrested and charged with possession of a concealed dirk or dagger in violation of section 12020, subdivision (a). It was alleged that he had suffered three prior convictions within the meaning of section 667.5, subdivision (b) and section 1203, subdivision (e)(4).

The defense theory of the case was that appellant, who was employed as a mechanic, had been using the knife as a tool for work on a car. A friend,

Betty Jones, telephoned appellant and asked if they could go to lunch. After he finished the repairs on the car, appellant put the knife and a pair of needlenose pliers in his pants pocket and drove to meet Ms. Jones. Appellant and Ms. Jones picked up food and were returning to another friend's house when they were stopped by the police. Appellant had forgotten that he had the knife in his pocket.

At trial, counsel for appellant sought to call Mike Rose, who employed appellant as a mechanic. The offer of proof was that Mr. Rose had purchased the knife for use in the repair of automobiles. Counsel for appellant also offered the testimony of Dana Holle, who would testify that on the date of his arrest, appellant had been using the knife to repair a car battery at 11:30 a.m.

The prosecutor objected to these witnesses and to any "testimony on the subject of the purpose for which the knife is used and the other legitimate purposes for the knife, whatever they are, repairing car batteries or cutting cables, or whatever that is, because that is not relevant in these proceedings. [¶] The code is very clear that it is possession that is at issue, not possession for any type of illegitimate purpose or possession for use as a weapon. That is not at issue."

The trial court agreed with the prosecutor. It reasoned: "[T]he problem is that the Legislature has defined the dirk or dagger because prior to the enactment of this section which defines this, [12020](c)(24), every time there is a dirk or dagger, there would be a challenge. And so you wind up with opinions by the court of appeal that actually had drawings of the instrument because the status as a dirk or dagger was subject to dispute. And so the Legislature, apparently in response to this, passed a specific definition [of] 12020(c)(24). [¶] The problem, as I see it, is that the issue is not in the legality of the device but in the concealability of it. Something that would be perfectly legal if it were not concealed is made illegal by being concealed. That appears to be what the case is in this matter. . . . [¶] This knife is not an illegal device. It is a legal device. What makes it a crime in this case is that it was concealed and the statute specifically says if it were not concealed, it would not be illegal. That is the problem. And so since it is not the legality of the device that is in issue, testimony on its use, its legal use, is irrelevant. [¶] If this were a baseball bat and your client were a Little League coach, certainly testimony would be relevant that he is carrying this bat to a game. But this is a concealed dirk and so the only issue is, is it a dirk according to the definition of section [12020](c)(24). Was it concealed. So the definition the jury will have as an instruction and can look at the device, and they will either as a question of fact agree, disagree, and then decide

whether it was concealed." The trial court offered appellant's counsel an opportunity to do further legal research on the issue and offered to reconsider its decision to exclude the testimony of Mr. Rose and Ms. Holle. The court also informed counsel that it would reconsider the issue at the close of the prosecution case. Counsel for appellant did not raise the issue again.

During its deliberations, the jury sent out a question: "Was the law broken if the defendant forgot he had the weapon in his pocket after leaving the job site, or was it broken as soon as he put the weapon in his pocket?" Counsel for appellant asked the court to respond that the law was not broken if appellant forgot he had the weapon and that it was not broken when he put the knife in his pocket because he was at work, not in a public place. The trial court and counsel reviewed the text of section 12020 and found no exception for possession of a concealed dirk or dagger in the workplace or at home. The trial court indicated that it wished to conduct additional research, because the response to the jury's question turned on whether concealing a weapon is a crime, no matter where it occurs.

The prosecutor pointed out that the Legislature had made a distinction between public and private places in drafting section 12031 on concealed firearms. She argued that if the Legislature intended to make the same distinction with respect to dirks or daggers, it would have used the same language in section 12020, subdivision (c)(24). She also argued that the evidence did not establish that the location where appellant was working on the car was not a public place. The court recessed to allow time for additional research.

Both counsel for appellant and the prosecutor reported that they had not found cases on point. The trial court cited *People* v. *Gonzales* (1995) 32 Cal.App.4th 229 [38 Cal.Rptr.2d 52], for the proposition that the offense turns on the design of the knife and that the intent of the person carrying it is not relevant. The trial court also cited *People* v. *Barela* (1991) 234 Cal.App.3d Supp. 15 [286 Cal.Rptr. 458] which held that the exception to the offense of carrying a concealed deadly weapon at a business location is limited to the owner of the business.

Counsel for appellant responded that there was no evidence as to where the work on the car was taking place. The trial court pointed out that the knife was given to appellant by Mr. Rose, his employer. The prosecutor argued that the answer to each of the jury's questions should be "Yes." The trial court agreed and informed the jury that the answer to each of its questions was "Yes."

The jury resumed deliberations after receiving the trial court's answer, and reached a verdict finding appellant guilty of carrying a dirk or dagger in violation of section 12020, subdivision (a).

The prior conviction allegations were tried to the jury and found to be true. The trial court sentenced appellant to a total term of five years in state prison—two years on count 1, and one year for each of the three prior convictions within the meaning of section 667.5, subdivision (b). He has filed a timely appeal.

## DISCUSSION

Section 12020, subdivision (a) makes it a felony-misdemeanor offense to carry a concealed dirk or dagger. Section 12020, subdivision (c)(24) defines dirk or dagger. The statute did not define "dirk or dagger" until it was amended in 1993. Since then, the statutory definition has been revised several times. It is the 1995 amendment which is relevant here. Until the Legislature adopted a definition, courts applied a broad judicial formulation: " 'A dagger has been defined as any straight knife to be worn on the person which is capable of inflicting death except what is commonly known as a 'pocket knife.' Dirk and dagger are used synonymously and consist of any straight stabbing weapon, as a dirk, stiletto, etc. (Century Dict.) They may consist of any weapon fitted primarily for stabbing. The word dagger is a generic term covering the dirk, stiletto, poniard, etc. (Standard Dict.)' [Citations.]" (*People* v. *Mowatt* (1997) 56 Cal.App.4th 713, 717 [65 Cal.Rptr.2d 722].)

In *People* v. *Forrest* (1967) 67 Cal.2d 478 [62 Cal.Rptr. 766, 432 P.2d 374], the Supreme Court held that a large pocketknife was not a dirk or dagger as a matter of law because it was not designed primarily for stabbing. (*Id.* at p. 481.) The court focused on the importance of distinguishing instruments which have innocent uses: "[W]hen a knife . . . has many possible uses, some of which are clearly innocent and utilitarian, also has a characteristic which in many situations will substantially limit the effectiveness of its use as a stabbing instrument, it cannot be held to be a weapon primarily designed for stabbing, and thus is not a dagger or dirk." (*Ibid.*)

In 1993, the Legislature enacted the first statutory definition, which was less comprehensive than the earlier judicial standard: "[A] 'dirk' or 'dagger' means a knife or other instrument with or without a handguard that is primarily designed, constructed, or altered to be a stabbing instrument designed to inflict great bodily injury or death." (Stats. 1993, ch. 357, § 1.)

The 1995 amendment changed the definition to read: "As used in this section, a 'dirk' or 'dagger' means a knife or other instrument with or without a handguard that is *capable of ready use as a stabbing weapon that may inflict great bodily injury or death.*" (§ 12020, subd. (c)(24) as amended by Stats. 1995, ch. 128, italics added; we refer to this change as the 1995 version of the statute.)

In *People* v. *Sisneros* (1997) 57 Cal.App.4th 1454 [67 Cal.Rptr.2d 782], the court construed the 1995 version of section 12020, subdivision (c)(24) as narrowing the category of instruments which may be "dirks or daggers" by requiring that the instrument be "capable of ready use," and therefore a device which requires assembly before it may be utilized as a weapon is excluded. (57 Cal.App.4th at p. 1457.) We agree with the *Sisneros* court on that point. The focus of the present dispute is another change effected in the same statute: the omission of the language in the 1993 statute that required the instrument to be "primarily designed" as a stabbing instrument "designed to inflict great bodily injury or death." Instead the 1995 version of the statute focuses on whether the instrument is "capable of ready use as a stabbing weapon that may inflict great bodily injury or death." On its face that would appear to include any number of instruments designed and commonly possessed for an innocent use, such as awls, scissors, and screwdrivers.

In *People* v. *Mowatt, supra,* 56 Cal.App.4th 713, the court considered the significance of the various definitions of dirk or dagger. *Mowatt* was governed by the 1993 version of the statute, since the offense occurred in 1994, before the 1995 version went into effect. In discussing the pre-1995 version, the *Mowatt* court observed: "It has long been recognized that section 12020, subdivision (a) proscribes some weapons that are inherently dangerous, and some that are not designed for use as weapons but can be used to wound or kill. 'The Legislature here sought to outlaw the classic instruments of violence and their homemade equivalents; the Legislature sought likewise to outlaw ·possession of the sometimes-useful object when the attendant circumstances, including the time, place, destination of the possessor, the alteration of the object from standard form, and other relevant facts indicated that the possessor would use the object for a dangerous, not harmless, purpose. . . .' (*People* v. *Grubb* (1965) 63 Cal.2d 614, 620-621 [47 Cal.Rptr. 772, 408 P.2d 100] (*Grubb*) . . . . [¶] The definition provided by the 1993 Legislature clearly designates dirks and daggers as 'classic instruments of violence and their homemade equivalents,' in the terms used by the *Grubb* court. While the case law definition was broad enough to include ordinary knives with stabbing capability, the Legislature's formulation tracked the technical definition of dirks and daggers as stabbing weapons distinct from knives, which are cutting tools that may also be used as weapons." (*Id.* at pp. 718-719, fns. omitted.)

The *Mowatt* court noted that the 1993 definition of dirk or dagger is consistent with " 'the long-held distinction between weapons that are inherently deadly or dangerous and those that are deadly or dangerous based only on the facts of the particular occasion in question.' [Citation.]" (56 Cal.App.4th at p. 719, fn. 4.) The court drew an analogy to cases construing statutes referring to deadly weapons: " ' "There are, first, those instrumentalities which are weapons in the strict sense of the word, and, second, those

instrumentalities which are not weapons in the strict sense of the word, but which may be used as such. The instrumentalities falling in the first class, such as guns, *dirks* and blackjacks, which are weapons in the strict sense of the word and are 'dangerous or deadly' to others in the ordinary use for which they are designed, may be said as a matter of law to be 'dangerous or deadly weapons.' . . . The instrumentalities falling into the second class, such as ordinary razors, pocket-knives, hatpins, canes, hammers, hatchets and *other sharp or heavy objects, which are not weapons in the strict sense of the word and are not 'dangerous or deadly' to others in the ordinary use for which they are designed,* may not be said as a matter of law to be 'dangerous or deadly weapons.' " ' [Citations.]" (*Ibid.*)

The 1995 version of section 12020, subdivision (c)(24), as the *Mowatt* court observed, is much broader, and encompasses both inherently dangerous stabbing weapons and instruments intended for harmless uses but also capable of inflicting serious harm. (56 Cal.App.4th at p. 719.) The Court of Appeal concluded that the hunting knife used by Mowatt would qualify as a "dirk or dagger" under either the 1995 version of the statute, or the pre-1993 judicial definition. (*Id.* at pp. 719-720.) But, under the 1993 legislative definition, the *Mowatt* court could not say that the hunting knife was "primarily designed" to inflict injury or death, but was instead primarily designed "for use as a cutting implement in various recreational activities . . ." and routinely possessed by many law-abiding citizens. (*Id.* at p. 720.)

In *Mowatt*, the Attorney General argued that a hunting knife is a "dirk or dagger" as shown by the defendant's attempted use of the object as a weapon. This contention was rejected because the defendant's intent in possessing the knife was irrelevant under the 1993 version of the statute, which focused only on whether the instrument is primarily designed for stabbing, without discussion of intent. (56 Cal.App.4th at p. 721.) "The rationale of the cases holding the possessor's intent irrelevant in prosecutions for carrying a concealed 'dirk or dagger' as defined by case law applies with greater force in prosecutions governed by the 1994-1995 statute, which treats dirks and daggers as inherently dangerous weapons regardless of the circumstances in which they are carried. [Citations.]" (*Ibid.*)

The *Mowatt* court anticipated the issue we face. "We note the current version of section 12020, subdivision (c)(24), which turns on whether a knife or other instrument is 'capable of ready use as a stabbing weapon,' casts the issue of intent in a different light. A persuasive argument could be made that by shifting from the design of the weapon to its capability for dangerous use, the Legislature opened the door for both the prosecution and the defense to introduce evidence of intended use when the implement at issue has innocent uses but may be considered dangerous under the circumstances of its possession. . . . [¶] Significantly, cases holding the defendant's intent irrelevant under the case law definition focus on that part of the

definition referring to a 'weapon fitted primarily for stabbing,' rather than the part referring to a knife 'capable of inflicting death.' [Citations.]" (56 Cal.App.4th at p. 721, fn. 7.)

Appellant is not specific in his contentions about the mens rea required by section 12020, subdivision (a). He characterizes the element as "a culpable mens rea" or as "the requisite mens rea, or 'evil-meaning mind.' " He argues that he had an innocent reason for possessing the knife which the jury was not allowed to consider.

Cases decided under the judicial definition of dirk or dagger were divided about the significance of the defendant's intent. In *In re Robert L.* (1980) 112 Cal.App.3d 401 [169 Cal.Rptr. 354] the court adopted the analysis of the Supreme Court in *People* v. *Grubb* (1965) 63 Cal.2d 614 [47 Cal.Rptr. 772], which held that the prosecution did not have to prove the defendant's intent to use a modified bat as a weapon, but that evidence of the circumstances of the possession is admissible to show a violation of section 12020. (63 Cal.2d at p. 621, fn. 9.) The defendant was held to have the burden of proving an innocent usage of the object as an affirmative defense. (*Id.* at p. 621.) Applying the *Grubb* principles, the court held that the jury could consider the surrounding circumstances and the subjective intent of the defendant to determine whether a concealed instrument (a common ice pick) was a dirk or dagger. (See also *In re Quintus W.* (1981) 120 Cal.App.3d 640 [175 Cal.Rptr. 30] [steak knife with blade four and five-eights inches long] and *People* v. *Ferguson* (1970) 7 Cal.App.3d 13 [86 Cal.Rptr. 383] [pointed butcher knife with eight-inch blade, one cutting edge].)

Other courts followed the approach of *Bills* v. *Superior Court* (1978) 86 Cal.App.3d 855 [150 Cal.Rptr. 582], which involved possession of a pair of unaltered barber scissors concealed in the defendant's glove. The defendant in *Bills* told police officers that the scissors were a weapon for his protection. Based on this admission, the Attorney General argued that defendant's purpose to use the scissors as a weapon presented a question of fact for the jury: whether under the circumstances, the scissors were a concealed dirk or dagger proscribed by section 12020. The court rejected that argument, holding that the intended use of the instrument is immaterial. It concluded that there was no question of fact for the jury where the instrument is an unaltered pair of barber scissors. (86 Cal.App.3d at p. 862; see also *People* v. *Barrios* (1992) 7 Cal.App.4th 501, 506 [8 Cal.Rptr.2d 666] [defendant's intent to use common bread knife as weapon for protection not admissible to establish it was concealed dirk or dagger under section 12020].)

As we have seen, the court in *People* v. *Mowatt* held that the possessor's intent is irrelevant in determining whether there was possession of a concealed dirk or dagger under the 1993 version of section 12020, subdivision (c)(24). (56 Cal.App.4th at p. 721.)

With this mixed jurisprudence on the role of the possessor's intent on the offense of carrying a concealed dirk or dagger in mind, we turn to appellant's arguments regarding the 1995 version of the statute.

In support of his argument that innocent intent in possessing the instrument is material to the crime, appellant cites section 20, which codifies a basic precept of criminal law: "In every crime . . . there must exist a union, or joint operation of act and intent, or criminal negligence." He also relies on the treatment of that concept by the United States Supreme Court in *Staples* v. *United States* (1994) 511 U.S. 600 [114 S.Ct. 1793, 128 L.Ed.2d 608].

In *Staples*, the defendant was charged with a violation of the National Firearms Act, 26 United States Code section 5801 et seq. The charge was based on possession of an AR-15 assault rifle which had been modified with a selector switch from an M-16 so that it was capable of fully automatic firing. The defendant offered evidence that the rifle had never fired automatically while in his possession, and had fired imperfectly in the semiautomatic mode. (511 U.S. at p. 603 [114 S.Ct. at p. 1796].) He was prosecuted under United States Code section 5861(d) of the act: " '[I]t shall be unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record.' " (511 U.S. at p. 605 [114 S.Ct. at p. 1797].)

As the *Staples* court observed, the federal statute is silent about what, if any, mens rea is required for a violation. This silence was not dispositive. "[S]ilence on this point by itself does not necessarily suggest that Congress intended to dispense with a conventional mens rea element, which would require that the defendant know the facts that make his conduct illegal. See [*United States* v. *Balint* (1922) 258 U.S. 250, 251 [42 S.Ct. 301, 302, 66 L.Ed. 604]] (stating that traditionally, 'scienter' was a necessary element in every crime). . . . On the contrary, we must construe the statute in light of the background rules of the common law, [citation], in which the requirement of some mens rea for a crime is firmly embedded. As we have observed, '[t]he existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence.' [Citation.] See also *Morissette* v. *United States*, 342 U.S. 246, 250 [72 S.Ct. 240, 243, 96 L.Ed. 288] (1952) ('The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil')." (*Staples* v. *United States, supra*, 511 U.S. at p. 605 [114 S.Ct. at p. 1797], italics omitted.)

The *Staples* court recognized a line of precedent that dispensed with the mens rea requirement in favor of a form of strict criminal liability in certain

public welfare or regulatory offenses when it was plain that Congress so intended. (511 U.S. at p. 606 [114 S.Ct. at p. 1797].) But the court explained that strict criminal liability offenses have been recognized only in limited circumstances. (*Id.* at pp. 606-607 [114 S.Ct. at p. 1798].) "In such situations, we have reasoned that as long as a defendant knows that he is dealing with a dangerous device of a character that places him 'in responsible relation to a public danger,' [citation], he should be alerted to the probability of strict regulation, and we have assumed that in such cases Congress intended to place the burden on the defendant to 'ascertain at his peril whether [his conduct] comes within the inhibition of the statute.' [Citation.] Thus, we essentially have relied on the nature of the statute and the particular character of the items regulated to determine whether congressional silence concerning the mental element of the offense should be interpreted as dispensing with conventional mens rea requirements. See generally *Morissette, supra,* at 252-260 [72 S.Ct. at pp. 244-248]." (*Id.* at p. 607 [114 S.Ct. at p. 798].) In footnote 3, following the passage just quoted, the *Staples* court examined the limitations of the strict criminal liability line of cases: "While use of the term 'strict liability' is really a misnomer, we have interpreted statutes defining public welfare offenses to eliminate the requirement of mens rea; that is, the requirement of a 'guilty mind' with respect to an element of a crime. Under such statutes we have not required that the defendant know the facts that make his conduct fit the definition of the offense. Generally speaking, such knowledge is necessary to establish mens rea, as is reflected in the maxim ignorantia facti excusat. [Citations.]" (511 U.S. at p. 608 [114 S.Ct. at p. 1798], fn. 3, italics omitted.) The court reversed the conviction, holding that the government should have been required to prove that the defendant knew of the features of the rifle that brought it within the scope of the act. (511 U.S. at p. 619 [114 S.Ct. at p. 1804].)

No California court has yet applied the reasoning of *Staples* to the offense of carrying a concealed dirk or dagger. But in *People* v. *Simon* (1995) 9 Cal.4th 493 [37 Cal.Rptr.2d 278, 886 P.2d 1271], the California Supreme Court addressed the issue of strict criminal liability in the context of a violation of the Corporate Securities Law of 1968 (Corp. Code, § 25000 et seq.). The issue was whether statutes which criminalize the sale or purchase of securities by means of oral or written communications which either contain false or misleading statements or omit material facts, create a strict liability offense. The *Simon* court concluded, "[K]nowledge of the falsity or misleading nature of a statement or of the materiality of an omission, or criminal negligence in failing to investigate and discover them, are elements of the criminal offense described in [Corporations Code] section 25401." (9 Cal.4th at p. 522.)

Construing the language of the California statute, the Supreme Court examined the limitations on strict criminal liability imposed by the United States Supreme Court: "Finally, we are mindful that '[t]he existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence.' [Citations.] The Supreme Court has indicated that regulatory or 'public welfare' offenses which dispense with any mens rea, scienter, or wrongful intent element are constitutionally permissible, but it has done so on the assumption that the conduct poses a threat to public health or safety, the penalty for those offenses is usually small, and the conviction does not do 'grave damage to an offender's reputation.' [Citation.] It has also observed that '[w]hile strict-liability offenses are not unknown to the criminal law and do not invariably offend constitutional requirements [citation], the limited circumstances in which Congress has created and this Court has recognized such offenses, [citations], attest to their generally disfavored status.' [Citation.]" (*People* v. *Simon, supra,* 9 Cal.4th at pp. 519-520, fn. omitted.)

The *Simon* court noted that the United States Supreme Court often has implied an intent element. "Notwithstanding this limited acceptance of such offenses, an acceptance that is qualified by the court's refusal to permit abandonment of a mens rea requirement if the statute involves conduct that would constitute a common law malum in se offense, the court continues to express concern about the due process implications of regulatory or public welfare offenses which impose strict liability regardless of fault or awareness that the conduct is prohibited. This concern is reflected in the court's attempt, whenever possible, to imply such intent or awareness in federal statutes, and its admonition that such statutes are more likely to pass constitutional muster if they regulate dangerous activities. [Citation.]" (9 Cal.4th at p. 520.)

The *Simon* court recognized that it had not had the occasion to consider the permissible scope of the public welfare or regulatory crime exception to the rule that criminal intent or negligence is a necessary element of a criminal offense. (9 Cal.4th at p. 521.) "[T]hat exception has not been applied in this state to offenses which, like section 25401, do not involve conduct which threatens the public health or safety and are punishable with lengthy prison terms. The exception continues to be restricted to crimes of the type described in *Vogel* [*People* v. *Vogel* (1956) 46 Cal.2d 798 [299 P.2d 850]]. (See, e.g., *People* v. *Matthews* (1992) 7 Cal.App.4th 1052, 1057 [9 Cal.Rptr.2d 348] [storage of hazardous waste]; *People* v. *Martin* (1989) 211 Cal.App.3d 699, 714 [259 Cal.Rptr. 770, 86 A.L.R.4th 383] [transportation and disposal of hazardous waste]; *People* v. *Chevron Chemical Co.* (1983) 143 Cal.App.3d 50, 53-54 [191 Cal.Rptr. 537] [discharge of wastes into

watercourse]; *Aantex Pest Control Co.* v. *Structural Pest Control Bd.* (1980) 108 Cal.App.3d 696 [166 Cal.Rptr. 763] [unlicensed poison].)" (*Ibid.*)

The court also recognized that strict criminal liability is increasingly disfavored. "We have recognized, however, a 'prevailing trend "away from the imposition of criminal sanctions in the absence of culpability where the governing statute, by implication or otherwise, expresses no legislative intent or policy to be served by imposing strict liability." (*People* v. *Hernandez* (1964) 61 Cal.2d 529, 533 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092]; . . .)' " (*People* v. *Simon, supra,* 9 Cal.4th at p. 521.)

In a literal sense, section 12020, subdivisions (a) and (c)(24) could be construed as imposing liability on anyone who conceals on his or her person a device that is capable of ready use as a stabbing weapon, whether or not the device is designed for another, innocent purpose, and possessed for that purpose. That reading would be so broad as to criminalize a large range of heretofore innocent conduct, acts that were never before regarded as criminal. The tailor who places a pair of scissors in his jacket and the carpenter who puts an awl in his pocket, each for the completely innocent purpose of using the instrument in his or her craft, would be felons. Unless the Legislature makes it clear that it intends so bizarre a result, we will not infer such a meaning.

At oral argument, respondent agreed this is not a strict liability offense and that it includes the mens rea of intent to use an instrument as a weapon.[1] But respondent argues that innocent use is an affirmative defense for the defendant to prove. We disagree; mens rea is an element of the offense to be proven by the People. (*People* v. *Flood* (1998) 18 Cal.4th 470, 481 [76 Cal.Rptr.2d 180, 957 P.2d 869].)

We conclude that the possession of a concealed dirk or dagger, as defined in the 1995 amendment, is not the sort of public welfare or regulatory offense for which strict criminal liability is imposed. The kinds of otherwise innocent devices swept within the scope of the statute do not place a person on notice that he or she is dealing with a dangerous device let alone

---

[1]In its petition for rehearing, respondent acknowledges conceding that "the offense was not a strict liability offense as that would criminalize the carrying of innocent objects." Respondent argues, however, that it believed the crime to be a general intent crime, as to which "the intent to use the instrument as a weapon was relevant to prove innocent objects were in fact dirks or daggers, not that the intent to use the object as a weapon is an element for all instruments." There are at least two problems with this argument. First, the present version of the statute draws no distinction between between objects defined as dirks or daggers at common law and innocent objects capable of being used as a stabbing weapon. Second, the error in this case lay in the trial court's refusal to allow the jury to consider appellant's intent in possessing the knife.

a "dirk or dagger" which poses a public danger, and which is therefore subject to strict regulation.

Under the present version of the statute (and unlike its previous versions, which focused on the designed purpose of the instrument) and the principles announced in *Staples* and *Simon*, we conclude that the prosecution must prove that a defendant charged with a violation of section 12020, subdivision (a) knew that he or she possessed a device "capable of ready use as a stabbing weapon that may inflict great bodily injury or death" and carried it for use as a weapon.

Here, the jury was told that appellant's intent was irrelevant. Appellant was precluded from presenting two witnesses who would have corroborated his testimony that the instrument at issue was a tool he used in his work as a mechanic. The jury was instructed, in effect, that appellant's intended or actual use of the instrument was irrelevant. Instructions on every material element of an offense are required. (*People* v. *Flood*, *supra*, 18 Cal.4th at pp. 480-481.) The defendant has a constitutional right to have the jury determine every material issue presented by the evidence. (*Id.* at p. 481.) The court's failure to have the jury determine appellant's mens rea was a violation of his right to due process under the California and federal Constitutions. (*Id.* at p. 482.) Under the circumstances of this case, we cannot say the error was harmless beyond a reasonable doubt, or that it is improbable that appellant would not have suffered the same result if the error had not been made.

The conviction must be reversed.

DISPOSITION

The judgment is reversed.

Vogel (C. S.), P. J., and Hastings, J., concurred.

A petition for a rehearing was denied February 9, 1999, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied March 17, 1999. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.