[Crim. No. 36469. Second Dist., Div. Two. Nov. 20, 1980.]

In re ROBERT L., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
ROBERT L., Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Patricia L. Reber, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz and Frederick Grab, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ROTH, P. J.—As the result of two petitions filed respectively April 17 and May 4, 1979, appellant was found to be a person described by Welfare and Institutions Code section 602 in that he had violated Penal Code sections 12020[1] (carrying concealed dirk or dagger), 211 (rob-

---

[1]The statute in pertinent part provides: "(a) Any person...who carries concealed upon his person any dirk or dagger, is guilty of a felony ...."

bery) and 487, subdivision 3 (grand theft auto). He was ordered committed to the California Youth Authority on concurrent terms associated with the described violations of one, two and three years. The appeal is from the judgment (order of commitment).

Most simply stated, appellant on January 29, 1979, was found to be carrying a concealed ice pick of ordinary commercial manufacture when he, among others, was subjected to a precautionary pat down search by officers who, after observing a traffic violation, had stopped the car in which the detainees were riding. Discovery of the ice pick occasioned the first of the petitions enumerated.

The second resulted from a photographic identification of appellant by the victim, as the person who, with numerous others, had participated in relieving one Julian Valdez of the money from his person and in thereafter stealing his car at about 5:30 a.m. on April 28, 1979.

■ Appellant's sole contention respecting the ice pick charge is that that instrument is not, as a matter of law, a "dirk or dagger" within the meaning of the statute. (See fn. 1.) We find the contention lacking in merit and conclude that, under the circumstances present, the trial court was justified in its determination the ice pick fell within the statutory proscription.

Our view in this respect, again (see *People* v. *Villagren* (1980) 106 Cal.App.3d 720, 727 [165 Cal.Rptr. 470]), derives from principles set out in *People* v. *Grubb* (1965) 63 Cal.2d 614 [47 Cal.Rptr. 772, 408 P.2d 100]. It was there observed that "The Legislature's understandable concern with the promiscuous possession of objects dangerous to the lives of members of the public finds manifestation in section 12020. ... [¶] ... The Legislature here sought to outlaw the classic instruments of violence and their homemade equivalents; the Legislature sought likewise to outlaw possession of the sometimes-useful object when the attendant circumstances, including the time, place, destination of the possessor, the alteration of the object from standard form, and other relevant facts indicated that the possessor would use the object for a dangerous, not harmless, purpose. (Cf. *People* v. *Freeman* (1927) 86 Cal.App. 374, 376 [260 P. 826].) [¶] Thus we hold that the statute embraces instruments other than those specially created or manufactured for criminal purposes; ..." (*Id.* at pp. 620-621; fn. omitted.)

Here, appellant was detained with five other persons by police at 2 a.m. The ice pick was discovered concealed in his waist band. When asked by one of the officers why he had it, appellant replied "You know why I carry it. It is for protection." Nothing further was necessary to show the instrument though "conceived for peaceful purposes,...was wrapped in the indicia and circumstance of probable assault." (*People* v. *Grubb, supra*, 63 Cal.2d 614, 622; cf. *People* v. *La Grande* (1979) 98 Cal.App.3d 871 [159 Cal.Rptr. 701]; *Bills* v. *Superior Court* (1978) 86 Cal.App.3d 855 [150 Cal.Rptr. 582]).

In the adjudication of the second petition hereinabove described appellant asserted by way of defense the alibi he was on the date of the robbery with his girl friend at a party and otherwise engaged with her in such fashion he could not have been involved in the crime.

In further support of his innocence, it was sought to have introduced the contents of a letter from one Father Santillan, appellant's Catholic priest, to the apparent effect someone else had stated to him that the declarant and not appellant was the culprit.[2] The justifying theory proffered was that the declaration, being one against penal interest, was properly admissible as an exception to the hearsay rule, since Father Santillan's refusal to disclose the declarant's identity made him (the declarant) unavailable as a witness. (See Evid. Code, § 1230.) The trial court's rejection of the offered evidence, accordingly, is cited as error. We hold the ruling was proper.

The following colloquy respecting the question provides the basis for our determination: "MR. FELKER: [Counsel for the prosecution] Your Honor, this does not qualify under any of the exceptions to the hearsay rule. Number one, declarations against penal interest, first of all, this person has not been shown to be unavailable, whoever made this. So we are not dealing with unavailability of witnesses.

"THE COURT: Absent that showing?

"MR. SANCHEZ: [Counsel for appellant] Your Honor, I believe I have shown it when I asked this witness [Father Santillan] whether he would reveal the name to me. There is absolutely no way I can produce this witness without knowing the name of him and, therefore, he is unavailable.

---

[2] The declaration was made to Father Santillan, not as part of a formal religious confession, but simply in the priest's office.

"...

"THE COURT: It would have to be subject to foundation. The Court would rule at this time the hearsay objection should stand, but you may inquire further as to availability of the witness.

"...

"Q. [Mr. Sanchez] If the Court were to order you [Father Santillan] to be jailed for as long as necessary before you revealed this name to me, what would be your response?

"A. I would have to go to jail.

"MR. SANCHEZ: I submit, your Honor, this witness is not available.

"MR. FELKER: Your Honor, we don't know this witness, number one—

"THE COURT: First of all, I think we have to inquire as to the availability of the witness itself, rather than as to the failure to disclose by the witness.

"MR. SANCHEZ: He is not available to me, your Honor. I couldn't produce him in court.

"THE COURT: But he is available somehow. The mere fact that the name has not been disclosed doesn't make him unavailable. He is available. He is somewhere. He exists and he is available. He would be subject to court process, but for one thing. We don't know his name.

"...

"MR. SANCHEZ: The Court is ruling this witness is available to me?

"THE COURT: The Court is ruling that there has been no showing that the witness falls within the category of unavailable witness, as set forth in the Evidence Code, and under the cases contained.

"...

"MR. SANCHEZ: I will not have this witness return, if the Court is ruling that this witness is available to me within Section 1230.

"THE COURT: The Court, again, is ruling that there has not been a sufficient showing that the witness is, in fact, unavailable as of this time, which is 12:25.

"That is not to preclude counsel from showing that witness is unavailable at subsequent hearings through this witness or any other witness. The Court is only ruling that there has not been a sufficient showing at this time, that the witness is unavailable.

".".     .     .     .     .     .     .     .     .     .     .     .     .     .     .

"MR. SANCHEZ: Your Honor, I'm not going to be able to present more evidence of the unavailability of this witness that made a statement to the priest."

Based upon the foregoing, it is clear to us the trial court was of the view an adequate showing of the declarant's unavailability had not been made. Thus while the most obvious source of his identity, i.e., the priest, was foreclosed, nothing was suggested which would indicate other possibilities for discovering his name and whereabouts were or would have been unavailing. By offering only that this information would not be forthcoming from Father Santillan, appellant, so far as the trial court was concerned, failed to satisfy his statutory burden as proponent of the evidence that the witness could not be produced through due diligence. We find no abuse of discretion in that determination. (See *People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261]; *People* v. *Smith* (1971) 22 Cal.App.3d 25, 32 [99 Cal.Rptr. 171].)

█ It is next contended certain comments made by the prosecution, respecting alleged threats to Julian Valdez, appellant's membership in a gang and whether certain defense witnesses were "covering up" for appellant, constituted prejudicial misconduct. Without detailing these statements, we deem it sufficient to observe both that the trial court, sitting without a jury, made it clear it was not influenced by them[3] and

---

[3]Thus the court remarked at one point "Well, let's not get into all that. The Court disregarded those comments." (concerning threats), and at another that "Let's not get into that at this time. The Court doesn't want to get into ancillary matters." (concerning gang membership).

that no objection thereto was made by appellant's trial counsel. Under such circumstances, no error requiring reversal has been shown. (See *People* v. *Green* (1980) 27 Cal.3d 1, 27-34 [164 Cal.Rptr. 1, 609 P.2d 468].)

■ Finally, it is maintained appellant was improperly committed to the Youth Authority, since a less restrictive disposition, which would have been appropriate, was not adequately considered by the trial court. We are satisfied, however, that a fair consideration of and justifiable reliance upon appellant's probation report were made below and that we may not properly interfere with the trial court's exercise of discretion in concluding as it did. (See *In re Michael R.* (1977) 73 Cal.App.3d 327 [140 Cal.Rptr. 716].) So, that report indicated in part that, "Both Mr. Green [camp-community placement coordinator] and Mr. Gonzalez [placement coordinator for East Los Angeles] feel that the minor is not a good subject for their respective programs due to the minor's negative orientation toward life, propensity towards violence, deep gang affiliations, overall sophistication, contempt for the life and property of others, and the need for long-term treatment in a secure, structured setting.

"The minor is most definitely not the type of person who should be returned to home and community under a grant of home on probation. Since the probation department has nothing left with which [to] effectively deal with the minor's rehabilitation, the California Youth Authority Expeditor, Mrs. Embree, was contacted and the minor's case discussed. She felt that the minor could be adequately handled and would benefit from a commitment to the California Youth Authority. Therefore, a recommendation of the California Youth Authority is being made at this time."

No more was necessary to sustain the trial court's conclusion. (See *In re Clarence B.* (1974) 37 Cal.App.3d 676 [112 Cal.Rptr. 474].)

The judgment is affirmed.

Fleming, J., concurred.

**COMPTON, J.,** Concurring and Dissenting.—I concur in the affirmance of the judgment on the basis that the minor committed a robbery and theft of a vehicle. I must respectfully dissent from that portion of the majority opinion which holds that an ordinary unaltered ice pick, an

item which can be purchased at any hardware or household section of a supermarket, is a "dirk or dagger" within the purview of Penal Code section 12020.

It may not be popular or even prudent at a point in our history where criminal violence has reached alarming proportions, to suggest that a person cannot be punished for carrying concealed on his person an instrument capable of inflicting severe injury or death.

On the other hand, if I am to be consistent in·my belief that the courts should not legislate in a field where the Legislature has elected not to do so, I am compelled to conclude that, however appealing, the result reached by the majority cannot be squared with the Legislature's terminology or intent.

Penal Code section 12020 prohibits the carrying of a "dirk or dagger" concealed on the person. The crime thus has two elements, (1) a "dirk or dagger," and (2) carrying it concealed on the person. It is bootstrapping to say that because an ice pick is carried concealed on the person, it is transformed into a "dirk or dagger." One element of the crime is thus used to supply the other element. I find it inescapable that *an ice pick is an ice pick.*

The Legislature was extremely selective in identifying the various instrumentalities to be controlled by the deadly weapons control law. Furthermore, the Legislature has had no difficulty, where it so desired, in specifying and describing such exotic instruments as a "nunchaku," a "wallet gun," a "cane gun," a "flechette dart," or "any instrument without handles consisting of a metal plate having three or more radiating points with one or more sharp edges and designed in the shape of a polygon, trefoil, cross, star, diamond or other geometric shape . . . ." (Pen. Code, § 12020.)

In view of that evidence of the Legislature's specificity, I find it hard to believe that the term "dirk or dagger" was intended as a catch all to cover ice picks, screw drivers, awls, metal punches, barbeque spits, or any other of a myriad of manufactured tools and household items which are capable of being used to stab someone.

As a result of my experience in the district attorney's office, I am personally aware of a number of attempts in the past to enact legislation to deal with the problem of persons who carry such instruments as

straightedge razors, ice picks, and the like. That those attempts were singularly unsuccessful[1] leads me to believe that the Legislature did not intend the result which the majority reaches here. I also respectfully suggest that this court's holding in *People* v. *Villagren* (1980) 106 Cal. App.3d 720 [165 Cal.Rptr. 470], was in error.

*People* v. *Grubb* (1965) 63 Cal.2d 614 [47 Cal.Rptr. 772, 408 P.2d 100], which is relied on by the majority, is clearly distinguishable. There the instrumentality started life as an ordinary baseball bat. By the time it was found in defendant's possession, however, the handle had been partly broken off and the remaining portion of the handle had been taped. It was thus no longer a baseball bat but was in fact a "billy."

Clearly the problem is one which should be addressed by the Legislature. The fact is, however, that as of this writing, the Legislature has not made it a crime for a person, under any circumstances, to carry concealed on his person those lawfully manufactured, and lawfully possessed, and otherwise useful instruments. It is not proper for this court, or any court, to attempt to plug the gap even though it feels strongly that the gap should be plugged.

Appellant's petition for a hearing by the Supreme Court was denied January 14, 1981. Bird, C. J., was of the opinion that the petition should be granted.

---

[1]The one notable exception is Penal Code section 626.10 which prohibits anyone, except certain specified persons, from bringing a switchblade-knife or razor onto a public school grounds.