[No. S081209. June 12, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
ERNESTO ARNOLDO RUBALCAVA, Defendant and Appellant.

**COUNSEL**

George A. Winkel, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BROWN, J.**—In this case we consider whether the unlawful carrying of a concealed dirk or dagger is a specific intent crime that imposes a sua sponte duty on trial courts to instruct with CALJIC No. 12.42. We conclude the offense does not have a specific intent requirement. Thus, courts have no duty to instruct the jury with CALJIC No. 12.42.

### FACTUAL AND PROCEDURAL BACKGROUND

On or about July 29, 1997, Officer Roland Elkins arrested defendant Ernesto Arnoldo Rubalcava on an outstanding warrant. During the arrest, Officer Elkins discovered a knife on Rubalcava's person. The knife had a blade roughly three inches long and a handle approximately three and one-eighth inches long. The tip of the blade was chipped. One side of the blade was "totally blunt," and the other side was dull. The blade, however, showed signs of having been sharpened at one time.

Based on his possession of the knife, Rubalcava was charged by information with one count of "willfully and unlawfully carrying concealed upon his/her person a dirk and dagger" in violation of section 12020, subdivision (a) of the Penal Code.[1] The information further alleged that Rubalcava committed the offense (1) while he was out on bail on another felony offense (§ 12022.1), and (2) within five years after his release from prison on another felony conviction (§ 667.5, subd. (b)).[2]

At trial, Officer Elkins testified that, upon arresting Rubalcava, he asked him whether he had any "weapons on him." According to Officer Elkins, Rubalcava replied that "he had a knife" and motioned with his head toward his right hip. Officer Elkins then stated he retrieved a knife from Rubalcava's right coin pocket—a knife he could not see before because Rubalcava wore a long white shirt that hung down to his thighs and covered the pocket and the handle of the knife protruding from the pocket. Officer Elkins also

---

[1] All further statutory references are to the Penal Code.

[2] The information also charged Rubalcava with willfully and unlawfully failing to appear. (§ 1320.5.) At trial, the jury deadlocked on this count, and the trial court declared a mistrial as to that count.

testified that Rubalcava carried a white plastic bag containing a pouch for holding sunglasses, a pair of wirecutters, two screwdrivers, a punch, a crescent wrench, a pair of pliers, some "bondo" tools and several other items.

Rubalcava testified on his own behalf and contradicted Officer Elkins's testimony on several fronts. He first stated he worked in an automotive body repair shop and was bringing tools to a friend after his doctor's appointment and only brought the knife because he kept it with his tools. Rubalcava then testified that, on the day of his arrest, he placed the knife and tools in the sunglasses pouch and had the pouch in his pocket and clipped to his belt. He further stated that he tucked his shirt in and wore the pouch with the knife in plain view because he did not want to be arrested for carrying a concealed weapon. According to Rubalcava, the knife was also a letter opener—and not a weapon. Finally, Rubalcava testified that, upon his arrest, an officer asked him whether he had any sharp objects or needles and that he only told the officer he had some tools and putty knives.

In rebuttal, Officer Curtis Hale testified that he saw Officer Elkins lift Rubalcava's loose shirt and retrieve a knife from his waistband area. He also claimed he could not see the knife when he approached Rubalcava. Based on his extensive training and experience with homemade weapons, Officer Hale opined that the knife had been sharpened at some point and could be used as a stabbing weapon. Officer Elkins also testified in rebuttal and reiterated his prior testimony.

At the close of testimony, the trial court instructed the jury on the elements of the crime of carrying a concealed dirk or dagger by reading modified versions of CALJIC Nos. 12.41 and 3.30. These instructions defined the offense as a "general intent" crime and stated that a defendant violates section 12020, subdivision (a) if he "carried a dirk or dagger" "substantially concealed upon his person" and "knew he was carrying the weapon."[3] Rubalcava did not object to these instructions, and did not request CALJIC No. 12.42—which stated that the jury may consider "intended use"

---

[3]The trial court provided the jury with the following instructions regarding the elements of a section 12020, subdivision (a) violation:

"Defendant is accused in count one of having violated section 12020, subdivision (a) of the Penal Code, a crime.

"Every person who carries concealed upon his person any dirk or dagger is guilty of a violation of Penal Code section 12020, subdivision (a), a crime.

"The words 'dirk' and 'dagger' are used synonymously and both mean a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death.

"You must determine whether the weapon introduced in evidence in this case is a dirk or dagger within the foregoing definition.

when determining whether the instrument is a dirk of dagger—or any other comparable instruction.[4]

The jury found Rubalcava guilty of carrying a concealed dirk or dagger. The trial court later sentenced Rubalcava to three years and eight months in prison to run consecutive to his four-year sentence in another case.

The Court of Appeal affirmed. The court rejected, among other things, Rubalcava's contention that the trial court erred by failing to instruct the jury sua sponte with CALJIC No. 12.42 because the intent to use the concealed instrument as a stabbing weapon is an element of the offense. In doing so, the court declined to follow *People v. Aubrey* (1999) 70 Cal.App.4th 1088 [83 Cal.Rptr.2d 209] (*Aubrey*), and *People v. Oskins* (1999) 69 Cal.App.4th 126 [81 Cal.Rptr.2d 383] (*Oskins*).

We granted review to determine whether the intent to use the concealed instrument as a stabbing weapon is an element of the crime of carrying a concealed dirk or dagger in violation of section 12020, thereby requiring the trial court to instruct the jury sua sponte with CALJIC No. 12.42.

## DISCUSSION

At the time of Rubalcava's arrest, section 12020, subdivision (a) stated in relevant part: "Any person in this state . . . who carries concealed upon his or her person any dirk or dagger is punishable by imprisonment in a county jail not exceeding one year or in the state prison." (Stats. 1995, ch. 128, § 2.) Section 12020, subdivision (c)(24) defined a " 'dirk' " or " 'dagger' " as "a

---

" 'Great bodily injury' refers to significant or substantial bodily injury or damage; it does not refer to trivial or insignificant injury or moderate harm.
"In order to prove this crime, each of the following three elements must be proved:
"One, a person carried a dirk or dagger;
"Two, the weapon was substantially concealed upon his person; and
"Three, the person knew he was carrying the weapon.
"A knife carried in a sheath, which is worn openly suspended from the waist of the wearer, is not a concealed weapon."
"In the crime charged in count one, namely, carrying a concealed dirk or dagger, there must exist a union or joint operation of act or conduct and general criminal intent. General intent does not require an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful."
[4]At the time of trial, CALJIC No. 12.42 stated: "In determining if the instrument or object in this case was a weapon of the kind within the law as stated, you may consider the circumstances attending any possession of the instrument or object by the defendant, such as the time and place of its possession; the destination of the possessor; any alteration of the object from its standard form; and evidence, if any, indicating its intended use by the possessor for·a dangerous rather than a harmless purpose."

knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death."

■ Relying on *Aubrey* and *Oskins*, Rubalcava contends that section 12020 makes the intent to use the concealed instrument as a stabbing weapon an element of the crime. Thus, the trial court erred by failing to instruct the jury with CALJIC No. 12.42 even though he did not request it. We disagree.

■ When interpreting a statute, "we turn first to the language of the statute, giving the words their ordinary meaning." (*People v. Birkett* (1999) 21 Cal.4th 226, 231 [87 Cal.Rptr.2d 205, 980 P.2d 912].) If the language permits more than one reasonable interpretation, then the court looks "to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154].) In the end, "[w]e must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." (*People v. Jenkins* (1995) 10 Cal.4th 234, 246 [40 Cal.Rptr.2d 903, 893 P.2d 1224].)

■ Here, the relevant language of section 12020 is unambiguous and establishes that carrying a concealed dirk or dagger does not require an intent to use the concealed instrument as a stabbing weapon. ■ "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*People v. Hood* (1969) 1 Cal.3d 444, 456-457 [82 Cal.Rptr. 618, 462 P.2d 370].) ■ Subdivision (a) of section 12020 describes a single criminal act— carrying a concealed dirk or dagger on the person—and makes no reference to any other act or consequence. Likewise, the definition of dirk or dagger in subdivision (c)(24) of that section focuses on the characteristics of the concealed instrument without explicitly or implicitly referring to the possessor's "intent to do a further act or achieve a future consequence." (*Hood, supra,* 1 Cal.3d at p. 457.) Accordingly, defendant's intended use is not an element of the crime, and "no further mental state beyond willing commission of the act proscribed by law" is necessary. (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215 [81 Cal.Rptr.2d 835, 970 P.2d 409].)

The legislative history provides further, albeit unnecessary, confirmation. Until 1994, section 12020 made it a crime to carry a concealed dirk or

dagger without defining the terms "dirk" or "dagger." (See *People v. Mowatt* (1997) 56 Cal.App.4th 713, 717 [65 Cal.Rptr.2d 722] (*Mowatt*).) As a result, courts provided their own definition: "A dagger has been defined as any straight knife to be worn on the person which is capable of inflicting death except what is commonly known as a 'pocket-knife.' Dirk and dagger are used synonymously and consist of any straight stabbing weapon, as a dirk, stiletto, etc. [Citation.] They may consist of any weapon fitted primarily for stabbing. The word dagger is a generic term covering the dirk, stiletto, poniard, etc." (*People v. Ruiz* (1928) 88 Cal.App. 502, 504 [263 P. 836]; see also *People v. Bain* (1971) 5 Cal.3d 839, 850-851 [97 Cal.Rptr. 684, 489 P.2d 564] [applying this definition]; *People v. Forrest* (1967) 67 Cal.2d 478, 480 [62 Cal.Rptr. 766, 432 P.2d 374] [same].)

Application of this judicially derived definition, however, was somewhat inconsistent. For example, various Courts of Appeal split over the relevance of defendant's intended use of the concealed instrument. Some courts held that the jury could *not* consider "the subjective intent of a knife's possessor when determining whether the concealed instrument was a dirk or dagger." (*People v. Barrios* (1992) 7 Cal.App.4th 501, 505 [8 Cal.Rptr.2d 666]; see also *People v. Gonzales* (1995) 32 Cal.App.4th 229, 233-234 [38 Cal.Rptr.2d 52]; *Bills v. Superior Court* (1978) 86 Cal.App.3d 855, 862 [150 Cal.Rptr. 582].) Meanwhile, other courts relied on *People v. Grubb* (1965) 63 Cal.2d 614 [47 Cal.Rptr. 772, 408 P.2d 100] (*Grubb*), to reach the opposite conclusion. (See, e.g., *In re Victor B.* (1994) 24 Cal.App.4th 521, 527 [29 Cal.Rptr.2d 362]; *In re Quintus W.* (1981) 120 Cal.App.3d 640, 645 [175 Cal.Rptr. 30]; *In re Robert L.* (1980) 112 Cal.App.3d 401, 404-405 [169 Cal.Rptr. 354]; *People v. Ferguson* (1970) 7 Cal.App.3d 13, 19-20 [86 Cal.Rptr. 383].)

Despite this conflict over the relevance of defendant's intended use to the dirk or dagger element of the offense, *no* court construed section 12020 as a specific intent crime. In fact, *Grubb*, the primary authority cited to support the relevance of defendant's subjective intent, expressly rejected such a construction. In *Grubb*, police officers discovered a broken baseball bat in the defendant's car. The defendant later told the police he carried the bat for self-defense and had struck people with it before. (*Grubb, supra*, 63 Cal.2d at pp. 616-617.) A jury convicted defendant of possessing a "billy" in violation of section 12020. (63 Cal.2d at p. 615.) Although reversing for other reasons, we held that the surrounding circumstances of possession—including defendant's intended use—were relevant to the issue of whether the bat was a prohibited weapon. (*Id.* at pp. 621-622 & fn. 9.) We, however, stated that "[t]he prosecution need *not* show the intent of the possessor to use an instrument in a violent manner." (*Id.* at p. 621, fn. 9, italics added.)

In 1993, the Legislature attempted to resolve the inconsistencies in the case law by enacting the first statutory definition of dirk or dagger. The 1993 version of section 12020, subdivision (c)(24), which became effective in 1994, defined "a 'dirk' or 'dagger' " as "a knife or other instrument with or without a handguard that is primarily designed, constructed, or altered to be a stabbing instrument designed to inflict great bodily injury or death." (Stats. 1993, ch. 357, § 1, p. 2155.) By emphasizing the design of the instrument "without implicating the possessor's intent," the Legislature adopted "[t]he rationale of the cases holding the possessor's intent irrelevant in prosecutions for carrying a concealed 'dirk or dagger.' " (*Mowatt, supra,* 56 Cal.App.4th at p. 721; see also Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1266 (1993-1994 Reg. Sess.) as amended Mar. 16, 1993, p. 1 ["AB 1266's definition is . . . consistent with . . . *Bills v. Superior Court* (1978) 86 Cal.App.3d [855, 861-862 [150 Cal.Rptr. 582]] . . . ."].)

Less than two years later, the Legislature changed the definition of "dirk" or "dagger" to the one at issue here.[5] Concerned that "gang members and other[s] who carry lethal knives hidden in their clothing [were] essentially immune from arrest and prosecution" under the 1993 definition (Sen. Rules Com., 3d reading analysis of Assem. Bill No. 1222 (1995-1996 Reg. Sess.) as amended May 31, 1995, p. 4; see also Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1222 (1995-1996 Reg. Sess.) as introduced Feb. 23, 1995, p. 2), the Legislature broadened the definition of dirk or dagger by replacing the phrase, "that is *primarily designed, constructed, or altered* to be a stabbing instrument," with the phrase, "that is *capable of ready use* as a stabbing weapon." (Compare Stats. 1993, ch. 357, § 1, p. 2155, with Stats. 1995, ch. 128, § 2, italics added.)

In doing so, the Legislature recognized that the new definition may criminalize the "innocent" carrying of legal instruments such as steak knives, scissors and metal knitting needles, but concluded "there is no need to carry such items concealed in public." (Sen. Com. on Crim. Procedure, Analysis of Assem. Bill No. 1222 (1995-1996 Reg. Sess.) as amended May 31, 1995, pp. 3, 5-6.) As a result, the Legislature made "[t]he unlawful concealed carrying of a dirk or dagger in Section 12020 . . . a *general intent crime*" and expressly stated that "[n]o intent for unlawful use would be required for violations of the prohibition on the concealed possession upon the person of an otherwise lawful dirk or dagger." (*Id.* at p. 6, italics added.)

---

[5]In 1997, the Legislature revised section 12020 once again. The new version did not alter the relevant language of the 1995 version of subdivisions (a) and (c)(24). Instead, the Legislature merely added the following sentence to subdivision (c)(24): "A nonlocking folding knife, a folding knife that is not prohibited by Section 653k, or a pocketknife is capable of ready use as a stabbing weapon that may inflict great bodily injury or death only if the blade of the knife is exposed and locked into position." (Stats. 1997, ch. 158, § 1.)

Thus, the legislative history is clear and unequivocal: the intent to use the concealed instrument as a stabbing instrument is *not* an element of the crime of carrying a concealed dirk or dagger. Indeed, the offense has *never* had such an intent requirement, and we find nothing suggesting an intent by the Legislature to alter this established rule.

Rubalcava cites no statutory language or legislative history to gainsay these unequivocal expressions of legislative intent. Moreover, *Aubrey* and *Oskins*—the two primary cases relied upon by Rubalcava—do not mention the legislative history and concede that subdivisions (a) and (c)(24) of section 12020, by their terms, do not make defendant's intended use of the instrument an element of the crime. (See *Aubrey, supra,* 70 Cal.App.4th at pp. 1101-1102; *Oskins, supra,* 69 Cal.App.4th at p. 138.) Rubalcava, however, contends that, without such an intent requirement, subdivisions (a) and (c)(24) would create a strict liability crime and be unconstitutionally vague and overbroad. Reiterating concerns raised by *Aubrey* and *Oskins,* Rubalcava argues that the Legislature could not have intended to make a felon out of "[t]he tailor who places a pair of scissors in his jacket[,] . . . the carpenter who puts an awl in his pocket" (*Oskins, supra,* 69 Cal.App.4th at p. 138), "the auto mechanic who absentmindedly slips a utility knife in his back pocket before going out to lunch[,] . . . the shopper who walks out of a kitchen-supply store with a recently purchased steak knife 'concealed' in his or her pocket, . . . the parent who wraps a sharp pointed knife in a paper towel and places it in his coat to carry into a PTA potluck dinner, or . . . the recreational user who tucks his 'throwing knives' into a pocket as he heads home after target practice or a game of mumblety-peg" (*Aubrey, supra,* 70 Cal.App.4th at p. 1102). Although the potentially broad reach of section 12020 in the absence of a specific intent element is troubling, these concerns do not render the statute unconstitutional.

As an initial matter, we dispel a misconception fostered by *Oskins* and repeated by Rubalcava: the absence of a specific intent requirement does *not* make the carrying of a concealed dirk or dagger a strict liability offense. (See *Oskins, supra,* 69 Cal.App.4th at pp. 138-139.) ■ Strict liability offenses eliminate the "requirement of *mens rea*; that is, the requirement of a 'guilty mind' with respect to an element of a crime." (*Staples v. United States* (1994) 511 U.S. 600, 607-608, fn. 3 [114 S.Ct. 1793, 1798, 128 L.Ed.2d 608].) As such, a defendant may be guilty of a strict liability offense even if he does not know "the facts that make his conduct fit the definition of the offense." (*Ibid.*) ■ By declining to make defendant's intended use of the instrument an element of the offense, we do not eliminate the mens rea requirement. Because the dirk or dagger portion of section 12020 criminalizes " 'traditionally lawful conduct,' " we construe the statute to

contain a "knowledge" element. (*People v. Coria* (1999) 21 Cal.4th 868, 880-881 [89 Cal.Rptr.2d 650, 985 P.2d 970].) Thus, to commit the offense, a defendant must still have the requisite *guilty mind*: that is, the defendant must knowingly and intentionally carry concealed upon his or her person an instrument "that is capable of ready use as a stabbing weapon." (§ 12020, subds. (a), (c)(24).) A defendant who does not know that he is carrying the weapon or that the concealed instrument may be used as a stabbing weapon is therefore not guilty of violating section 12020.[6]

With this understanding, we now address Rubalcava's constitutional challenges. First, his contention that section 12020, in the absence of a specific intent requirement, is void for vagueness in violation of due process is meritless.[7] ▪ A law is void for vagueness only if it "fails to provide adequate notice to those who must observe its strictures" and " 'impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.' " (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1116 [60 Cal.Rptr.2d 277, 929 P.2d 596], quoting *Grayned v. City of Rockford* (1972) 408 U.S. 104, 108-109 [92 S.Ct. 2294, 2298-2299, 33 L.Ed.2d 222].) ▪ Rubalcava identifies *no* vague terms in the statute that may be open to multiple interpretations. Instead, he claims the resulting criminalization of "otherwise wholly innocent conduct" would make section 12020 unconstitutionally vague. (*Aubrey, supra*, 70 Cal.App.4th at p. 1102.) ▪ The mere fact that a statute may criminalize previously legal conduct does not, however, make a statute unconstitutionally vague especially where, as here, the statutory language and legislative history indicate the Legislature intended such a result. (See *Pryor v. Municipal Court* (1979) 25 Cal.3d 238, 246 [158 Cal.Rptr. 330, 599 P.2d 636] [When determining whether a statute is "sufficiently specific to meet constitutional standards . . . [,] we look first to the language of the statute, then to its legislative history, and finally to California decisions construing the statutory language."].) ▪ In any event, we have previously held that section 12020 is not unconstitutionally vague despite the absence of a specific intent

---

[6]For example, a person could slip a knife into a defendant's pocket without his knowledge or give a defendant a fixed-blade knife wrapped in a paper towel, but tell the defendant the knife has a folding blade that cannot lock. In these cases, the defendant would lack the necessary mens rea.

[7]We reject the People's contention that Rubalcava lacks standing to assert this challenge because he cannot "attack a statute on grounds that are not shown to be applicable to himself." (*In re Cregler* (1961) 56 Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305].) At trial, Rubalcava claimed he used the knife as a letter opener and did not intend to use it as a weapon. The physical characteristics of the blade supported his claim. Because Rubalcava arguably falls within the class of "innocent" carriers who are "not supposed to be" covered by the statute, he has standing to raise the vagueness challenge. (See *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1095 [40 Cal.Rptr.2d 402, 892 P.2d 1145].)

element and see no reason to reconsider this determination. (See *Grubb*, *supra*, 63 Cal.2d at p. 619.)

Second, Rubalcava's overbreadth challenge fails, even assuming arguendo that the overbreadth doctrine applies outside the First Amendment context. (See *Tobe v. City of Santa Ana*, *supra*, 9 Cal.4th at pp. 1095-1096, fn. 15.) A statute is only overbroad if it "prohibits a ' "substantial amount of constitutionally protected conduct." ' " (*Id.* at p. 1095.) Rubalcava asserts that the omission of a specific intent requirement would result in the substantial infringement of rights guaranteed by the First and Fourth Amendments. In support, he cites general examples of the statute's overbreadth. He, however, describes *no* instances where the statute actually infringes on constitutionally protected conduct, and we can think of none. Even though section 12020 may seem overbroad as a matter of common sense, we will not find it *unconstitutionally* overbroad without some concrete impairment of constitutionally protected conduct.

Although we conclude that section 12020 is not unconstitutionally vague or overbroad, we echo the concerns over the breadth of the statute raised by Rubalcava. As written, section 12020, subdivisions (a) and (c)(24) may criminalize seemingly innocent conduct. Consequently, the statute may invite arbitrary and discriminatory enforcement *not* due to any vagueness in the statutory language but due to the wide range of otherwise innocent conduct it proscribes. Indeed, the Legislature suggested this very possibility. (See Sen. Com. on Crim. Procedure, Analysis of Assem. Bill No. 1222 (1995-1996 Reg. Sess.) as amended May 31, 1995, p. 6 ["Proponents of this bill would possibly suggest that everyone—peace officers, prosecutors, judges, and juries—knows what is considered 'bad' carrying of a concealed dirk or dagger, cite *Grubb* (*supra*), and argue that is the protection against possibly overzealous use of the Penal Code proscriptions on such conduct"].) While the wisdom of this solution to the gang problem may certainly be questioned (cf. *In re Jasper* (1973) 30 Cal.App.3d 985, 989 [106 Cal.Rptr. 754] [a person who innocently carries a knife into a courtroom should not be held in contempt]), "[t]he role of the judiciary is not to rewrite legislation to satisfy the court's, rather than the Legislature's, sense of balance and order." (*People v. Carter* (1997) 58 Cal.App.4th 128, 134 [67 Cal.Rptr.2d 845].) We must therefore leave it to the Legislature to reconsider the wisdom of its statutory enactments.

Because a defendant may be guilty of carrying a concealed dirk or dagger without intending to use the instrument as a stabbing weapon, the trial court did not err by failing to instruct with CALJIC No. 12.42. Trial courts only have a sua sponte duty to instruct on "the general principles of law

relevant to and governing the case." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311 [18 Cal.Rptr.2d 796, 850 P.2d 1].) "That obligation includes instructions on all of the elements of a charged offense" (*ibid.*), and on recognized "defenses . . . and on the relationship of these defenses to the elements of the charged offense." (*People v. Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913], overruled on other grounds by *People v. Breverman* (1998) 19 Cal.4th 142, 178, fn. 26 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) ▮ In this case, defendant's intended use of the instrument is neither an element of the offense nor a defense. Accordingly, we hold that the trial court had no duty to give CALJIC No. 12.42.[8]

## DISPOSITION

For the foregoing reasons, we affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**MOSK, J.**—I concur in the result.

A crime generally comprises elements of mental state and also conduct or consequences or both.

In Penal Code section 12020 (section 12020) declares it a crime, as either a felony or a misdemeanor, for "[a]ny person" to "[c]arr[y] concealed upon his or her person any dirk or dagger." (*Id.*, subd. (a)(4).) It defines a "dirk" or "dagger" to mean any "instrument," including a "knife," "that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death." (*Id.*, subd. (c)(24).)

I agree with the majority in their resolution of the issue that is crucial to review: Section 12020 does *not* comprise among its elements any mental state entailing intent to use the instrument in question as a stabbing weapon. Its language excludes such an element. Its legislative history confirms the fact.

Were I to proceed further and attempt to determine what mental state, if any, section 12020 comprises among its elements, I would commence by turning my attention to first principles.

"In every crime," since the very establishment of our polity, there has had to "exist" a "union" or "joint operation" of "act" and "intent" or "criminal

---

[8] We disapprove of *People v. Aubrey, supra,* 70 Cal.App.4th at page 1088, and *People v. Oskins, supra,* 69 Cal.App.4th at page 126, to the extent they conflict with our decision here.

negligence." So provided section 1 of the Act Concerning Crimes and Punishments of 1850. (Stats. 1850, ch. 99, § 1, p. 229.) So provides Penal Code section 20 (section 20), its successor, which was enacted with the code in 1872 and has never been amended.

By providing as it does, Penal Code section 20 requires a mental state (see *People v. Vogel* (1956) 46 Cal.2d 798, 801, fn. 2 [299 P.2d 850]) along with conduct and/or consequences. More specifically, it requires a mental state whose culpability amounts at least to "criminal negligence." (See *People v. Sargent* (1999) 19 Cal.4th 1206, 1215 [81 Cal.Rptr.2d 835, 970 P.2d 409]; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 113, p. 133.) In current terminology, "criminal negligence" entails recklessness. (E.g., *People v. Penny* (1955) 44 Cal.2d 861, 879 [285 P.2d 926]; *People v. Sargent, supra,* 19 Cal.4th at p. 1215 [following *Penny*].)

Section 20's requirement of a mental state along with conduct and/or consequences is general. (See *People v. Stuart* (1956) 47 Cal.2d 167, 171 [302 P.2d 5, 55 A.L.R.2d 705]; see also *People v. Hernandez* (1964) 61 Cal.2d 529, 532-533 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092].) But it is not inexorable. (See *People v. Stuart, supra,* 47 Cal.2d at p. 171; see also *People v. Hernandez, supra,* 61 Cal.2d at pp. 532-533.) A crime can dispense with a mental state altogether. (See *People v. Simon* (1995) 9 Cal.4th 493, 521 [37 Cal.Rptr.2d 278, 886 P.2d 1271].) Thus it is with a so-called strict liability offense—whose "purpose" is generally "to protect public health and safety" and whose "penalt[y]" is generally "relatively light." (*Ibid.*) But, if a crime does not dispense with a mental state, section 20 operates, as it were, by default. (See *People v. Stuart, supra,* 47 Cal.2d at p. 171.) In other words, if a crime gives no indication whether it requires a mental state, section 20 effectively requires one. And, if a crime gives no indication what mental state it requires, section 20 effectively requires "criminal negligence" in the sense of recklessness.

I incline toward the view that section 20 does not operate by default with respect to section 12020. As indicated, section 12020 proscribes an actor's carrying of any concealed instrument that is capable of inflicting great bodily injury or death. I tend to believe, as do the majority, that section 12020 requires a mental state of the actor. And I tend to believe, as do the majority, that the mental state that section 12020 requires involves at least knowledge of the existence and nature of the instrument in question. My reasons are these. The evil that section 12020 is designed to prevent is the actor's carrying of any instrument that is capable of inflicting great bodily injury or death and, ultimately, his actual infliction thereof. For such harm to eventuate, the actor must obviously carry an instrument of the kind described. Otherwise, he could not inflict harm of the degree indicated, being

without the means necessary. But, in addition, he must apparently know of the instrument's existence and nature. Otherwise, he could similarly not inflict harm of the degree indicated, being without *awareness of* the means necessary.

In any event, were I to attempt to determine section 12020's mental element, I would altogether avoid any invocation of "general intent" and "specific intent."[1] "For such notions do not assist in performing the task at hand, which is to explicate" section 12020. (*People v. Sargent, supra*, 19 Cal.4th at pp. 1228-1229 (conc. opn. of Mosk, J.).) " 'General intent' and 'specific intent' 'evolved as labels to identify' particular offenses, with 'specific intent' 'admitting . . . the defense of voluntary intoxication' and 'general intent' not doing so. [Citations.] 'General intent' has usually been affixed if the mental element of an offense entails only an intent to engage in certain proscribed conduct. [Citation.] In contrast, 'specific intent' has usually been affixed if the mental element of an offense entails an intent to engage in certain proscribed conduct for the purpose of bringing about, or allowing, a certain proscribed result. [Citation.] 'General intent' and 'specific intent' have shown themselves to be 'notoriously difficult . . . to define and apply.' [Citations.] For this reason, 'they have proved to be mischievous.' " (*Id.* at p. 1228.)

Because the capability of an instrument to inflict great bodily injury or death does not depend on its intended use by the actor, I agree with the majority that the superior court did not err when it failed to instruct the jury sua sponte that it did, and I further agree that the Court of Appeal in turn did not err when it refused to find the superior court's failure erroneous.

Therefore, I concur in the result.

**WERDEGAR, J., Concurring.**—The majority acknowledges that the current statutory prohibition on carrying a concealed "dirk or dagger" (Pen. Code, § 12020, subds. (a), (c)(24)) may be "overbroad as a matter of common sense . . . [¶] . . . due to the wide range of otherwise innocent conduct it proscribes" (maj. opn., *ante*, at p. 333), but holds the defect is not a constitutional one and the remedy, if any, must therefore be legislative. I agree; I write separately only with the hope of pointing the way toward a possible solution.

In 1993, responding to judicial pleas for a clear definition of the terms, the Legislature set out to define "dirk or dagger" as used in Penal Code section

---

[1]Even though legislative staff have not done so. (See maj. opn., *ante*, at pp. 330-331.)

12020. (Assem. Com. on Public Safety, analysis of Assem. Bill No. 1266 (1993-1994 Reg. Sess.) as amended Mar. 16, 1993, p. 2; see *People v. Wharton* (1992) 5 Cal.App.4th 72, 77, fn. 3 [6 Cal.Rptr.2d 673]; *People v. Pettway* (1991) 233 Cal.App.3d 1067, 1070, fn. 1 [285 Cal.Rptr. 147].) The resulting definition ("a knife or other instrument with or without a hand-guard that is primarily designed, constructed, or altered to be a stabbing instrument designed to inflict great bodily injury or death" [Stats. 1993, ch. 357, § 1, p. 2155]) was clear enough, but ultimately proved too narrow and too difficult of proof. Prosecutors complained that "since we can never show that the primary purpose of a butcher knife, hunting knife, survival knife, ice pick, etc., is to cause death or great bodily injury by stabbing, we cannot obtain convictions under the statute," even when the person was carrying the concealed instrument for potential use as a weapon. (Sen. Rules Com., 3d reading analysis of Assem. Bill No. 1222 (1995-1996 Reg. Sess.) as amended May 31, 1995, p. 4.)

In 1995, the Legislature sought to cure this defect by replacing "primarily designed, constructed, or altered" with a much more inclusive reference to instruments "capable of ready use" as a lethal stabbing weapon. (Stats. 1995, ch. 128, § 2.) Though slightly narrowed in 1997 to exclude nonlocking folding knives (see maj. opn., *ante*, at p. 330, fn. 5), "capable of ready use as a stabbing weapon" remains the general characteristic marking a dirk or dagger under Penal Code section 12020. This broad definition, unfortunately, makes a felon, at least in theory, of " 'the tailor who places a pair of scissors in his jacket and the carpenter who puts an awl in his pocket' [citation], or the auto mechanic who absentmindedly slips a utility knife in his back pocket before going out to lunch [citation], . . . the shopper who walks out of a kitchen-supply store with a recently purchased steak knife 'concealed' in his or her pocket, or the parent who wraps a sharp pointed knife in a paper towel and places it in his coat to carry into a PTA potluck dinner . . . ." (*People v. Aubrey* (1999) 70 Cal.App.4th 1088, 1102 [83 Cal.Rptr.2d 209], quoting *People v. Oskins* (1999) 69 Cal.App.4th 126, 138 [81 Cal.Rptr.2d 383].)

The *Aubrey-Oskins* solution to this overbreadth problem—requiring intent to carry the instrument for use as a weapon—cannot be adopted judicially for the reason explained in the majority opinion: it is inconsistent with the clear legislative intent. (Maj. opn., *ante*, at pp. 330-331.)[1] Moreover, a universal requirement that the People prove intent to use the dirk or dagger

---

[1]By its use of the artfully ambiguous phrase "intentionally carry concealed" (maj. opn., *ante*, at p. 332), the majority opinion apparently leaves open the question whether Penal Code section 12020, subdivision (a) requires proof that the defendant intentionally concealed the

as a weapon would threaten to narrow the enforceable scope of Penal Code section 12020 unwisely. Carrying concealed on the person a true dagger—an instrument primarily intended for, and suitable for little but, stabbing people—is a dangerous, unjustified act regardless of the person's immediate intent. It is the policy of Penal Code section 12020 to prohibit the possession and carrying of all such instruments "common to the criminal's arsenal" (*People v. Grubb* (1965) 63 Cal.2d 614, 620 [47 Cal.Rptr. 772, 408 P.2d 100]) because of the unwarranted danger their very presence creates to public safety, for "[e]asy access to instruments of violence may very well increase the risk of violence." (*Ibid.*) To require proof of intent to use a dagger as a weapon would be inconsistent with that policy.

It appears from this history that any *single* definition of "dirk or dagger" is likely to be either too narrow (leaving out true daggers carried concealed for any reason as well as other sharp instruments carried as potential weapons) or too broad (taking in a wide variety of useful tools carried for innocent purposes). Perhaps, however, a *double* definition can be crafted that avoids both these pitfalls. It would seem consistent with all the legislative goals to define "dirk or dagger" as including both (i) any knife or other instrument primarily designed, constructed, or altered to be a stabbing instrument that may inflict great bodily injury or death, and (ii) any knife or other instrument capable of ready use as a stabbing weapon that may inflict great bodily injury or death, when carried for potential use as a weapon. Under such a definition those who carry, concealed on their persons, knives suitable solely or primarily for stabbing would be subject to prosecution without proof of their intent, but those carrying kitchen knives, fishing knives, awls, or scissors, for example, would be subject to the penal sanctions of Penal Code section 12020 only if the circumstances were such as to create the inference (or, of course, if direct evidence showed) their contemplated use for the instrument was stabbing others, rather than preparing food, scaling fish, cutting cloth or other civil uses.

With this suggestion for possible legislative revision, I join the majority in holding that the current statutory prohibition on carrying a concealed dirk or

---

dirk or dagger on his person, or only that the defendant intentionally carried the instrument, which was in fact not visible. Neither the statutory language nor the legislative history is explicit on this point. Reading an intent-to-conceal element into the statute may not be consistent with its overall purposes, as carrying a concealed dagger is dangerous to public safety whether or not the bearer purposely concealed the weapon. Imposing an intent-to-conceal requirement would, however, be an effective way of narrowing the statute's overbroad scope; the carpenter who puts an awl in his pocket, or the parent carrying a kitchen knife to the PTA potluck, would probably not be found to have intentionally concealed the instrument.

dagger does not require proof of, or a jury instruction concerning, the defendant's intended use of the instrument as a weapon.