[No. C053116. Third Dist. Feb. 15, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
RICKEY LEE MAYBERRY, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[1]]**

---

[1] The Reporter of Decisions is directed to publish the opinion except for part II of the Factual and Procedural Background.

## COUNSEL

Gideon Margolis, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BLEASE, Acting P. J.**—Defendant Rickey Lee Mayberry battered the victim with a standard weighted workout glove containing sand in the palm area. A jury found him guilty of battery with serious bodily injury (Pen. Code, § 243, subd. (d); count one)[2] and possession of a dangerous weapon. (§ 12020, subd. (a)(1); count two.)[3]

Defendant's principal claim on appeal is that the workout glove is not within the list of weapons prohibited by the last clause of section 12020, subdivision (a)(1), which derives from the Dangerous Weapons Control Law of 1923. (Stats. 1923, ch. 339, § 1, p. 696.) We agree.

The subdivision prohibits the possession of "any instrument or weapon of the kind *commonly known* as a blackjack, slungshot, billy, sandclub, sap, or sandbag." (§ 12020, subd. (a)(1), italics added.) The trial court instructed the jury that defendant was guilty of the offense if he "possessed a weighted glove[,] . . . knew that he possessed the weighted glove [and] possessed the object as a weapon."

In the published portion of the opinion we conclude that a workout glove is not "commonly known" as a "sandclub . . . or sandbag," regardless that it contained sand or was used by defendant to hit a victim in the face causing serious injuries, because it did not share any of their descriptive characteristics. "[T]he prosecution [failed to] prove that the item had the necessary

---

[2] All further section references are to the Penal Code.

[3] Defendant waived trial by jury on a prior strike allegation (§§ 667, subds. (b)–(i), 1170.12, 1192.7, subd. (c)), and the trial court impliedly found the allegation true. Defendant was sentenced to an aggregate term of six years in state prison, consisting of the middle term of three years doubled on count one, and the middle term of two years doubled on count two, stayed pursuant to section 654. He received 202 days of presentence custody credits (176 days of actual credit and 26 days of conduct credit).

characteristic to fall within the statutory description." (*People v. King* (2006) 38 Cal.4th 617, 627 [42 Cal.Rptr.3d 743, 133 P.3d 636].)

The offense appropriate to defendant's conduct in this case is a battery, for which the jury also found him guilty.

We shall reverse defendant's conviction on count two, award him an additional 62 days of presentence custody credits, and affirm the judgment in all other respects.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant hit Steve Bingham in the face with his left hand, causing Bingham to suffer serious bodily injuries. At the time, defendant was wearing "a black weighted glove" on his left hand. The glove belonged to Jeffrey Clark, who testified it was a "standard workout glove[]" he purchased at Longs Drugs. It was made of neoprene, with "a little weight to it." It was weighted with sand in the palm and/or "fist area."

In count two of the information, defendant was charged with "possess[ing] an instrument and weapon of the kind commonly known as a weighted glove." The jury was instructed in pertinent part: "[D]efendant is charged in [c]ount [t]wo with unlawfully possessing a weapon, specifically, a weighted glove. [¶] To prove that the defendant is guilty of this crime, the People must prove that; [¶] One, the defendant possessed a weighted glove; [¶] Two, the defendant knew that he possessed the weighted glove; [¶] And, three, the defendant possessed the object as a weapon."

During closing argument, the People told the jury that the glove worn by defendant was "no different than what the Penal Code describes as a sandbag. [¶] Getting hit with a glove filled with sand is equal to if not exactly the same as getting hit in the face by someone with a bag of sand. Just because the sand is contained in a glove doesn't make it any different."

The jury found defendant guilty of illegally possessing a weapon "as charged in [c]ount [t]wo of the [i]nformation."

## I

The last clause of section 12020, subdivision (a)(1), prohibits the "possess[ion of] . . . any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sap, or sandbag."[4]

Defendant contends there is insufficient evidence to support his conviction for violating section 12020, subdivision (a)(1), because a weighted glove "is not one of the items enumerated in" that subdivision. The People concede the point and we accept the concession for the following reasons.

At issue are the criteria by which the characteristics that define an item subject to section 12020, subdivision (a)(1), are to be measured. This may be resolved as a matter of law.[5]

The trial court instructed the jury that the workout glove was within section 12020, subdivision (a)(1), and that defendant violated the section if he knew the item was a workout glove and that he possessed the glove as a weapon. The trial court apparently assumed that any object containing sand and used to batter a person is a "sandclub . . . or sandbag." That stretches the terms beyond recognition.

The prosecutor argued below that the means by which the workout glove was used to batter the victim transformed it into a sandclub or sandbag. "Getting hit with a glove filled with sand is equal to if not exactly the same as getting hit in the face by someone with a bag of sand."

■ The prosecutor confused a functional with a descriptive definition. Section 12020, subdivision (a)(1), does not define the prohibited items by the

---

[4] Section 12020, subdivision (a)(1) provides in its entirety: "(a) Any person in this state who does any of the following is punishable by imprisonment in a county jail not exceeding one year or in the state prison: [¶] (1) Manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any cane gun or wallet gun, any undetectable firearm, any firearm which is not immediately recognizable as a firearm, any camouflaging firearm container, any ammunition which contains or consists of any flechette dart, any bullet containing or carrying an explosive agent, any ballistic knife, any multiburst trigger activator, any nunchaku, any short-barreled shotgun, any short-barreled rifle, any metal knuckles, any belt buckle knife, any leaded cane, any zip gun, any shuriken, any unconventional pistol, any lipstick case knife, any cane sword, any shobi-zue, any air gauge knife, any writing pen knife, any metal military practice handgrenade or metal replica handgrenade, or any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sap, or sandbag."

[5] Whether the court may instruct the jury that a given item is an item "commonly known" as one of the items proscribed by section 12020, subdivision (a)(1), turns on whether the issue may be resolved as a matter of law. Definitional issues may turn on the facts. That may arise if the factual characteristics of the item are in dispute. They must first be determined by the jury. In this case the issue may be resolved adversely to the trial court because the court used the wrong legal measure.

means of their use. It defines them as they are "commonly known," such that it is the descriptive characteristics of the item that make it dangerous. It is the purpose of the law to bar the possession or carrying of an instrument that is customarily viewed as a dangerous weapon.

The last clause of section 12020, subdivision (a)(1), including the terms "sandclub . . . or sandbag" derive from the Dangerous Weapons Control Law of 1923. (Stats. 1923, ch. 339, § 1, p. 696.)[6] "The Legislature obviously sought to condemn weapons common to the criminal's arsenal; it meant as well 'to outlaw instruments which are ordinarily used for criminal and unlawful purposes.' . . ." (*People v. Grubb* (1965) 63 Cal.2d 614, 620 [47 Cal.Rptr. 772, 408 P.2d 100], citations omitted.)

In *People v. Mulherin* (1934) 140 Cal.App. 212 at pages 214–215 [35 P.2d 174], the court observed that "[a]ll the instruments mentioned [in the 1923 statute], with the exception of metal knuckles, belong to a certain species of weapon having so many characteristics in common that their slight differences are unimportant. They are all . . . short, easily concealed upon the person and so weighted as to constitute effective and silent weapons of attack. Any one of them, in our opinion, would be properly described by the general term, 'sap', and we believe that a sand-bag, such as a piece of hose loaded with sand, is occasionally correctly described as a black-jack."[7] Moreover, Black's Law Dictionary defines a "sap" as "[a] club, a blackjack, a hose containing rocks in the middle, or any other object generally used as a bludgeon" and a sandclub or sandbag as "[a] tube of strong, flexible material filled with sand, by which a heavy blow may be struck which leaves little or no mark on the skin. . . . It is included in the general term *sap*."[8] (Black's Law Dict. (8th ed. 2004) p. 1369 [sap]; *id.* (4th ed. 1968) p. 1507 [sandclub or sandbag].)

A standard workout glove containing a small amount of sand, even when used as a weapon, is not an "instrument or weapon of the kind *commonly known as* a blackjack, slungshot, billy, sandclub, sap, or sandbag."

---

[6] The uncodified statute of 1923 provided that "every person . . . who . . . possesses any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sandclub, sandbag, or metal knuckles" is guilty of a criminal offense. The preamble of the statute defined its purpose inter alia as "to prohibit . . . possession or carrying of certain . . . dangerous weapons within this state . . . ." (Stats. 1923, ch. 339, pp. 696, 695.)

[7] The court said that the Legislature "very likely with appreciation of the difficulties of nomenclature, forbade ownership of any instrument or weapon '*of the kind*', as commonly known. The purpose undoubtedly was to outlaw instruments which are ordinarily used 'for criminal and improper purposes'. . . ." (*People v. Mulherin, supra*, 140 Cal.App. at p. 215, citations omitted, italics added.)

[8] The term "sap" was not included in the list enacted in 1923. It was added by Statutes of 1988, chapter 1269, section 2.7, page 4229.

(§ 12020, subd. (a)(1), italics added.) That an object, like a sandclub or sandbag, contains sand and is used as a bludgeon, is insufficient to bring it within section 12020, subdivision (a)(1), for the sand is there to fulfill an ordinary and innocent function. Section 12020, subdivision (a)(1) does not prohibit the possession of any instrument or weapon that bears some irrelevant characteristic of the weapon listed. ■ Crimes by analogy, that include items within the statutory policy but without the statutory language are prohibited by the criminal law. "In California all crimes are statutory and there are no common law crimes. Only the Legislature and not the courts may make conduct criminal." (*In re Brown* (1973) 9 Cal.3d 612, 624 [108 Cal.Rptr. 465, 510 P.2d 1017].)

■ However, the use of a prohibited item may bear on the defendant's scienter. That is, the circumstances of the defendant's possession or use of an item can defease a defendant's criminal liability for possession of an item that is a "prohibited weapon" but cannot alter its descriptive characteristics.

The prosecutor below argued that the mere means of use of an item may transform it into a proscribed item. That is not correct. It is the descriptive characteristics of the item which define it. It is true that an item that was not originally a dangerous weapon within the items listed in section 12020, subdivision (a)(1), may be made into one by suitable alterations. In *People v. Grubb* a jury convicted the defendant of carrying a "billy," in the form of a broken (shortened) baseball bat, taped at the smaller end, because "[p]ossibly the . . . bat has been so altered from its original condition that it falls into the . . . category" of "instruments dangerous in their ordinary use . . . ." (*People v. Grubb, supra*, 63 Cal.2d at p. 621, fn. 8.)[9] However, the workout glove was not altered, and likely could not have been, to make it a sandbag, "[a] tube of strong, flexible material filled with sand, by which a heavy blow

---

[9] The court described the weapon, found in a parked car, as "a small baseball bat. The last few inches of the handle had been broken from the bat; the instrument was 20 inches long, taped at the smaller or handle end, and heavier at the unaltered end." (*People v. Grubb, supra*, 63 Cal.2d at p. 616.) The court "adopt[ed]" a test for "billy," similar to that in *People v. Raleigh* (1932) 128 Cal.App. 105 [16 P.2d 752], as used in Penal Code section 211a, "to encompass, first, instruments dangerous in their ordinary use and, second, in some circumstances, instruments not dangerous in their ordinary use." (*People v. Grubb, supra*, 63 Cal.2d at p. 621, fn. 8.)

In *Grubb* the court said, in dicta: "The Legislature . . . decrees as criminal the possession of ordinarily harmless objects when the circumstances of possession demonstrate an immediate atmosphere of danger. Accordingly the statute would encompass the possession of a table leg, in one sense an obviously useful item, when it is detached from the table and carried at night in a 'tough' neighborhood to the scene of a riot. On the other hand the section would not penalize the Little Leaguer at bat in a baseball game." (*People v. Grubb, supra*, 63 Cal.2d at p. 621.) However, in *Grubb*, a jury convicted the defendant of carrying a "billy," in the form of a broken baseball bat, wrapped at one end. In that form it was not a baseball bat.

may be struck which leaves little or no mark on the skin," as described in Black's Law Dictionary (4th ed. 1968) page 1507.

■ Following the enactment of the Dangerous Weapons Control Law of 1923, "disguised weapons" were added that had alternative, innocent uses.[10] To rule out an innocent possession the Supreme Court has required that the prosecution prove that the defendant had actual knowledge of the characteristic that made possession of the item unlawful. (See *People v. King, supra,* 38 Cal.4th at p. 626 ["It is highly unlikely that the Legislature intended that a person possessing an item listed in section 12020(a)(1) for its lawful, utilitarian purpose, but unaware of the characteristic that makes possession of the item illegal, would nevertheless be guilty of violating section 12020(a)(1)."]) However, the defendant's knowledge does not change the descriptive nature of the proscribed object but serves only to defease the criminal nature of its possession.[11] "First, the prosecution must prove that the item had the necessary characteristic to fall within the statutory description." (*People v. King, supra,* 38 Cal.4th at p. 627.)

Applying these rules in this case "it is clear [because the trial court used the wrong legal measure] that there is a total absence of any evidence to sustain defendant's conviction" for possession of a prohibited weapon and therefore, his conviction on that count must be reversed. (*People v. Golden* (1946) 76 Cal.App.2d 769, 770–771 [174 P.2d 32] [reversing defendant's conviction based on possession of a "monkey fist" for lack of sufficient evidence because "a 'monkey fist' [is not] commonly known as a black-jack, slungshot, billy, sand-club, sandbag or metal knuckle"].)

II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[10] See, for example, the items listed in footnote 6 of *People v. King, supra,* 38 Cal.4th at page 626.

[11] The Supreme Court has used language that could mislead one into the belief that the descriptive characteristics of an object can be altered by its use. It said, in reference to *Grubb* that "the surrounding circumstances of possession—including defendant's intended use—were relevant to the issue of whether the bat was a prohibited weapon." (*People v. Rubalcava* (2000) 23 Cal.4th 322, 329 [96 Cal.Rptr.2d 735, 1 P.3d 52], citing to *People v. Grubb, supra,* 63 Cal.2d at pp. 621–622 & fn. 9.) However, that properly refers to the defendant's scienter, not the defining characteristics of the object. As noted in *King,* which followed *Rubalcava,* the circumstances in which an object is carried or the intent of the carrier cannot alter the descriptive characteristics of the object. It can only annul the criminal character in the circumstances of its possession.

*See footnote, *ante,* page 165.

## DISPOSITION

The judgment is modified to reverse count two and reflect that defendant has 265 days of presentence custody credits, consisting of 177 days of actual credit and 88 days of conduct credit. As modified, the judgment is affirmed.

The trial court is directed to prepare an amended abstract of judgment to reflect this change to defendant's presentence credit. The trial court is further directed to forward a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.

Morrison, J., and Robie, J., concurred.