Filed 12/14/20; See concurring opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHNATHAN LEE HESTER,<br><br>    Defendant and Appellant. | B299886<br><br>(Los Angeles County<br> Super. Ct. No. SA099360) |

APPEAL from the judgment of the Superior Court of Los Angeles County.  Mark E. Windham, Judge.  Affirmed.

Glenn L. Savard, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and appellant Johnathan Lee Hester challenges the sufficiency of the evidence supporting his conviction, following a bench trial, of making criminal threats and carrying a concealed dirk or dagger.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendant was charged by information with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1); count 1), criminal threats (§ 422, subd. (a); count 2) and carrying a concealed dirk or dagger (§ 21310; count 3).  It was also alleged defendant used a dangerous weapon in the commission of count 2 and had suffered two prior felony convictions within the meaning of section 667, subdivision (a)(1) and the "Three Strikes" law (§§ 667, subds. (b)–(j), 1170.12).

Defendant waived his right to a jury trial and the case proceeded to a bench trial in June 2019.  The testimony received at trial established the following material facts.

On the evening of November 7, 2018, Sabrina O'Hara was leaving her home in West Hollywood to meet some friends for dinner, when she heard someone yelling "help."  She saw a man slumped against a wall.  She walked over to him and asked if he was hurt.  He said yes and she noticed his hand was bleeding.

Ms. O'Hara used her cell phone to call 911 and, at the same time, ran back into her house to get a towel to put on the man's wound to try to stop the bleeding.  When she came back outside, Ms. O'Hara saw another man walking down the street.  She recognized the man because she had seen him several times before—at least once at the neighborhood 7-Eleven store and twice in the alley near her home.  In court, she identified defendant as the man she saw that night.

Ms. O'Hara said defendant had a goatee and was tall, probably six feet. He was wearing dark clothing, including a black "hoodie" sweatshirt, and was carrying a black backpack on his back. The backpack was large and looked overstuffed. He was yelling at the man with the bloody hand.

Ms. O'Hara testified it was dark outside but she could see defendant "clearly." He was about 15 to 16 feet from her. Defendant was yelling angrily at the other man, saying "I'll fuckin' do it again. I'll kill you." Defendant then noticed Ms. O'Hara and said "who are you, bitch?" and "I'll fuckin' kill you."

Ms. O'Hara was scared but stayed with the injured man and reassured him that help was coming. She was still on the phone with 911. Ms. O'Hara yelled at defendant that the police were on their way. She then asked the injured man who had attacked him, and he pointed in the direction of defendant. Deputy sheriffs arrived on the scene shortly thereafter.

An audio recording of Ms. O'Hara's 911 call was played, and she confirmed her voice on the recording. In the recording, Ms. O'Hara reported that a tall, homeless man, wearing all black and carrying a backpack, attacked another man, threatened her and had left the area through the alley.

Deputy Sheriff Anthony Gamboa testified that when he arrived at the scene, paramedics were already treating the victim. His hand was bloody and appeared to have a deep cut. The man was "hysterical" and kept saying he was going to die.

Deputy Gamboa spoke with Ms. O'Hara, who was still standing nearby, and then broadcast on his radio her description of the suspect. Ms. O'Hara told him she recognized defendant as a homeless person who was often in the nearby alley. Shortly

thereafter, two other deputies who had responded to the call reported they had detained a possible suspect in the alley. He was tall, wearing dark clothing, with a dark-colored backpack.

Deputy Gamboa drove Ms. O'Hara to the location for a field identification. He read her the required admonitions and she then identified defendant as the person that threatened her and was yelling at the victim. Ms. O'Hara also pointed out that she recognized the large, overstuffed backpack sitting on the ground which defendant had been wearing on his back.

Defendant was searched and a box cutter was found in the right pocket of his pants. It was a folding box cutter that locked into place when opened. When in the locked open position, the exposed portion of the blade was about an inch in length and very sharp. A second box cutter was found in the side pocket of defendant's backpack. It also locked when in the open position, exposing a sharp, one-inch blade. No visible blood was on either box cutter, nor were there visible blood drops or smears on defendant.

At the close of the prosecution's case-in-chief, the court denied in part and granted in part defendant's motion pursuant to Penal Code section 1118.1, dismissing count 1.

Defendant presented two witnesses. Deputy Grehtel Barraza testified that at the time of booking, defendant identified an address in Van Nuys as his home address and did not say he was homeless.

Defendant also called Dr. Mitchell Eisen, a psychologist. He described his education and training and explained he had studied the issue of eyewitness memory and suggestibility for over 20 years. He stated his opinion that identification

4

procedures, like a field identification, where only one individual is presented, are improperly suggestive.

The court found defendant guilty of counts 2 and 3, explaining in detail its reasoning and analysis of the evidence. The court found defendant's two prior felony convictions from 1990 and 1993 remote in time, and also acknowledged defendant had struggled with drug addiction and homelessness. The court therefore granted, in part, defendant's motion pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, striking both prior convictions for purposes of Penal Code section 667, subdivision (a)(1). The court also struck one prior conviction for purposes of the Three Strikes law. The court granted the prosecution's motion to dismiss the use of a dangerous weapon allegation as to count 2.

The court sentenced defendant to six years in prison calculated as follows: the high term of three years, doubled due to the prior strike, on count 2, and a concurrent term of six years on count 3 (high term doubled). The court awarded defendant 460 days of presentence custody credits. Finding defendant had no ability to pay, the court exercised its discretion not to impose any fines or fees.

This appeal followed.

## DISCUSSION

Defendant challenges the sufficiency of the evidence in support of his conviction on both counts. We review the record according to the familiar standard. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 ["In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is

5

reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."].)  We conclude both counts are supported by substantial evidence.

Defendant first contends the testimony of Ms. O'Hara, the sole percipient witness, was of negligible weight and insufficient to sustain a finding of guilt on count 2.  He argues she could not recall material facts and gave inconsistent accounts of the incident.

Defendant asks us to reweigh the evidence which we decline to do.  Witness credibility is a question solely for the trier of fact.  (*People v. Boyer* (2006) 38 Cal.4th 412, 480 (*Boyer*); see also *People v. Zaragoza* (2016) 1 Cal.5th 21, 44 [it is not the task of a reviewing court to "resolve credibility issues or evidentiary conflicts"].)  "[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction."  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)  There is nothing in the record to support a conclusion that Ms. O'Hara's testimony was inherently improbable.

The court thoroughly explained the reasons why it found Ms. O'Hara's testimony credible.  The law is clear that the "[i]dentification of the defendant by a single eyewitness may be sufficient to prove the defendant's identity as the perpetrator of a crime.  [Citation.]  Moreover, a testifying witness's out-of-court identification is probative for that purpose and can, by itself, be sufficient evidence of the defendant's guilt even if the witness does not confirm it in court."  (*Boyer*, *supra*, 38 Cal.4th at p. 480.)  The record amply supports the court's conclusion that defendant was guilty on count 2.

Defendant next contends that a closed box cutter without an exposed blade is not, as a matter of law, a dirk or dagger, citing to language in Penal Code section 16470. He says both box cutters were closed and the blades were not exposed and therefore there is no evidence supporting his conviction on count 3 for carrying a concealed dirk or dagger in violation of section 21310.

Penal Code section 16470 defines a dirk or dagger as "a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death." (*Ibid.*) This definitional language is immediately followed by an exemption: "A nonlocking folding knife, a folding knife that is not prohibited by Section 21510[, i.e., a switchblade], or a pocketknife is capable of ready use as a stabbing weapon that may inflict great bodily injury or death only if the blade of the knife is exposed and locked into position." (*Ibid.*)

Deputy Gamboa testified the box cutter found in defendant's pants pocket was a "folding box cutter" with a button on the handle. When the button was depressed, the blade slid open and locked into a fixed position. The button had to be depressed again to retract the blade into the handle. The box cutter found in the side pocket of defendant's backpack was a "non-folding box cutter" that had a button to slide the blade open and which locked the blade into place. The button had to be pushed again to retract the blade.

Neither box cutter was a nonlocking folding knife. Defendant concedes that both box cutters locked into a fixed position when open and therefore do not qualify as nonlocking

knives.  The box cutters obviously were not pocketknives, and defendant does not contend they were.

Defendant maintains however that because the blades on both box cutters either folded into the handle (the one found in his pocket) or retracted with a push of a button (the one found in his backpack), they qualify as non-switchblade folding knives and the statutory exemption therefore applies.

We are not persuaded.  Penal Code section 16470 excludes only nonlocking folding knives, non-switchblade folding knives, and pocketknives.  The box cutter in defendant's backpack was nonfolding.  If the Legislature had wanted to exclude nonfolding box cutters from the definition of "dirk" or "dagger," or to exclude all box cutters as they chose to exclude all pocketknives, they could have said so.  "Our function is not to judge the wisdom of statutes.  [Citation.]  Nor are we empowered to insert what a legislative body has omitted from its enactments."  (*Wells Fargo Bank v. Superior Court* (1991) 53 Cal.3d 1082, 1099; see also *People v. Albillar* (2010) 51 Cal.4th 47, 54–55 [in construing statutory language, reviewing court must give words " 'their ordinary and usual meaning' " and view them in context " 'because the statutory language is usually the most reliable indicator of legislative intent' "].)

Defendant's reliance on *People v. Aledamat* (2019) 8 Cal.5th 1 is misplaced.  *Aledamat* concerned a charge of assault with a deadly weapon, a box cutter.  *Aledamat* held the trial court erred by instructing the jury that a box cutter was an inherently deadly weapon.  The court was not called upon to interpret the language of Penal Code section 16470, which defines "dirk" or "dagger."  The question whether the box cutter used by the defendant in *Aledamat* was a "dirk" or "dagger" was not in issue.  The question

8

whether the box cutters defendant possessed were deadly weapons is not in issue in this case, as the court dismissed the use of a dangerous weapon allegation.

Moreover, the concern expressed in the concurring opinion about statutory overbreadth is unfounded. The Supreme Court has held the definition of dirk or dagger includes a knowledge element. (*People v. Rubalcava* (2000) 23 Cal.4th 322, 331–332, discussing former Pen. Code, § 12020.) "Thus, to commit the offense, a defendant must still have the requisite *guilty mind*: that is, the defendant must knowingly and intentionally carry concealed upon his or her person an instrument 'that is capable of ready use as a stabbing weapon.' " (*Rubalcava,* at p. 332.)

"In addition to incorporating a knowledge element, the California Supreme Court has generally recognized that when a defendant is charged with an offense that penalizes possession of an instrument that is ordinarily usable for peaceful purposes, the defendant may justify the possession by showing the possession was 'in accordance with [the instrument's] ordinary legitimate design.' " (*People v. Mitchell* (2012) 209 Cal.App.4th 1364, 1372, quoting *People v. Grubb* (1965) 63 Cal.2d 614, 621, fn. 9; see also CALCRIM No. 2501 ["When deciding whether the defendant knew the object [(could be used as a stabbing weapon)], consider all the surrounding circumstances, including the time and place of possession. Consider also (the destination of the defendant[,]/the alteration of the object from standard form[,]) and other facts, if any."].)

Defendant relies on *People v. Pellecer* (2013) 215 Cal.App.4th 508 (*Pellecer*) to support his argument the box cutter in his backpack was not concealed on his person within the meaning of Penal Code section 21310. (There is no dispute the

9

box cutter found in defendant's pants pocket was concealed upon his person.)  Section 21310 prohibits carrying a dirk or dagger concealed "upon the person."  (*Ibid.*)

In *Pellecer*, the defendant had been "leaning" on a backpack later found to contain three knives.  (*Pellecer*, *supra*, 215 Cal.App.4th at p. 511.)  *Pellecer* explained it was "not the function of the courts to judge the wisdom of statutes or the way they are written" and concluded that if the Legislature had intended to proscribe the concealment of a dirk or dagger in a container that was carried, it could have easily chosen to include such language but instead used language commonly understood to mean on the body or in one's clothing.  (*Ibid.*)

However, subsequent to *Pellecer*, the Supreme Court decided *People v. Wade* (2016) 63 Cal.4th 137 (*Wade*).  *Wade* construed similar language in Penal Code section 25850, subdivision (a) which proscribes the carrying, in a public place, of a loaded firearm "on the person" and held it included the carrying of the firearm in a backpack worn on the body.  (*Wade,* at pp. 143–145.)  The court rejected the defendant's argument the phrase should be narrowly construed, positing a hypothetical illuminating why the defendant's construction was untenable.  "It would require, for example that we treat differently a gun in a zippered pocket of a pair of cargo pants—which would violate the statute—from a gun in a fanny pack tied around the waist— which would not violate the statute—even though, from the perspective of easy access, the gun at the waist might be closer at hand than the gun in the knee pocket of the cargo pants."  (*Id.* at p. 145.)

*Wade* distinguished *Pellecer*, explaining that it was factually distinguishable because the defendant there "was

10

*merely leaning* on the backpack and thus, arguably, had less immediate control over its contents than defendant had in this case, where he was actually wearing the backpack." (*Wade*, *supra*, 63 Cal.4th at p. 146, italics added.)

Defendant here was wearing the backpack containing the box cutter and the box cutter was therefore on his person within the meaning of Penal Code section 21310. (*Wade*, *supra*, 63 Cal.4th at pp. 145–146.)

We agree with the concurring opinion that a morally blameless person carrying a concealed box cutter for innocent purposes, such as a grocery store worker, carpenter or car mechanic, cannot be convicted of violating Penal Code section 21310. Defendant was convicted of violating section 21310 because he inflicted a deep, bloody wound on the victim and yelled at the victim as he sat slumped against a wall that defendant would kill him (and the eyewitness, too), leaving the victim in hysterical fear of death. This defendant was not morally blameless, and our holding does not invite prosecutors to prosecute morally blameless people.

## DISPOSITION

The judgment of conviction is affirmed.


GRIMES, J.


I CONCUR:


BIGELOW, P. J.

11

**WILEY, J.**, Concurring.

Today's holding itself is like a box cutter: a very sharp tool, so you better handle it with care and know what you are doing.

Box cutters are useful. They are *very* common tools. But here we rule box cutters are dirks or daggers, which are illegal to possess if you have one in your pocket. The defendant in this case, Hester, got six years in prison for carrying a box cutter that way.

This does make sense, ultimately, based on the posture of this case; I concur in the judgment. But the matter is rather complex and, in some respects, uncertain. I'll explain why.

First we must grapple with the statutory language, which is bizarrely broad and is the result of a century of puzzlement over how California will regulate street weapons.

Second, we must interpret this statute according to a standard canon: courts construe criminal statutes by presuming the Legislature meant to outlaw only morally blameworthy conduct. I'll explain what that means and provide authority.

Third, this holding that box cutters are dirks or daggers is right only if we read the statute also to ensure it cannot condemn morally blameless people. There is a way to do that; in fact, a line or two from existing case law gives exactly that interpretation. But those few passing lines deserve more emphasis, especially in the standard jury instruction, which omits them entirely. The CALCRIM Committee should take note. And there is latent uncertainty our Supreme Court may someday wish to probe.

1

# I

First, it should raise eyebrows that an ordinary box cutter is an illegal dirk or dagger. Grocery store workers often carry a box cutter in their pocket. These people, and many others too, will be mightily surprised to learn they could be *criminals* because box cutters are illegal dirks or daggers. The prosecution urges this unprecedented reading of the law. Until today, no court has agreed.

Here is the statute. I italicize the 10 key words:

As used in this part, "dirk" or "dagger" means a knife or *other instrument* with or without a handguard that is *capable of ready use as a stabbing weapon* that may inflict great bodily injury or death. A nonlocking folding knife, a folding knife that is not prohibited by Section 21510, or a pocketknife is capable of ready use as a stabbing weapon that may inflict great bodily injury or death only if the blade of the knife is exposed and locked into position. (Pen. Code, § 16470.)

The question is whether an ordinary box cutter with a retractable blade is a dirk or dagger.

Certainly the words of the statute—"*other instrument . . . capable of ready use as a stabbing weapon*"—can be interpreted to cover a box cutter. A box cutter indeed "may inflict great bodily injury." But so can anything that can poke you in the eye, *like a sharp stick*. That is the problem: this statutory language is stupendously broad.

This language equally includes:

1. pencils,
2. pens,
3. nails,
4. barbecue forks,

2

5. sewing needles,
6. knitting needles,
7. screwdrivers,
8. letter openers,
9. scissors, and
10. a miniature replica of the Eiffel Tower.

According to this expansive language, if you are sitting around a campfire aimlessly whittling a point on a stick, you are making yourself a dirk or dagger.

So the problem this case poses is, *how can this possibly be right?*

With this decision, we join in a historic and century-long California struggle to define what weapon-like pocket objects can send you to prison. The effort began in 1917. (*People v. Castillolopez* (2016) 63 Cal.4th 322, 327–329 [tracing evolution since then] (*Castillolopez*).) The statute in its current form dates in substance from 1997. (*Id.* at pp. 328–329.) Cases from before 1997 grappled with a different statute than this current one.

Our job is to interpret this statute to ascertain legislative intent so we can effectuate the purpose of the law. We look first to the statutory words themselves, but we do not consider them in isolation. Rather we examine the entirety of the statute to determine its scope and purpose. We construe its words in context and harmonize all its parts. (*Castillolopez, supra,* 63 Cal.4th at p. 329.)

An abiding concern throughout this statute's history has been its stupendous breadth. (E.g., *People v. Rubalcava* (2000) 23 Cal.4th 322, 331 (*Rubalcava*) [it is "troubling" this statute reaches tailors with scissors in their jackets, carpenters with awls in their pockets, car mechanics with a utility knife in their

3

back pockets before going out to lunch, shoppers walking out of a kitchen-supply store with a recently purchased steak knife "concealed" in a pocket, and parents who wrap a sharp pointed knife in a paper towel and place it in a coat " 'to carry into a PTA potluck' "]; *id.* at p. 333 ["we echo the concerns over the breadth of the statute," which "may criminalize seemingly innocent conduct. Consequently, the statute may invite arbitrary and discriminatory enforcement . . . due to the wide range of otherwise innocent conduct it proscribes."].)

Today's holding raises a concern that a box cutter in your pocket now is a serious crime—for anyone. Were that concern valid, you would be left to hope that no unfriendly people noticed you, or, if they did, that the police and prosecutor would not regard you as unworthy or undesirable for some reason. Our Supreme Court has said this statute thus seems "overbroad as a matter of common sense," for it may "invite arbitrary and discriminatory enforcement . . . due to the wide range of otherwise innocent conduct it proscribes." (*Rubalcava, supra,* 23 Cal.4th at p. 333.)

Proper statutory interpretation must notice and solve this problem.

## II

Proper interpretation of criminal statutes begins with the premise that our Legislature intended to reserve the power and shame of the criminal sanction only for those who are morally blameworthy. That premise is the law.

The American inclination to confine criminal liability to morally blameworthy people is old. "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and

4

persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." (*Morissette v. United States* (1952) 342 U.S. 246, 250 (*Morissette*).)

The central thought is that defendants must be blameworthy in mind before they can be found guilty, "a concept courts have expressed over time through various terms such as *mens rea*, scienter, malice aforethought, guilty knowledge, and the like." (*Elonis v. United States* (2015) 575 U.S. 723, ___ [135 S.Ct. 2001, 2009] (*Elonis*), quoting *Morissette*, *supra*, 342 U.S. at p. 252.)

This central thought "took deep and early root in American soil." (*Morissette*, *supra*, 342 U.S. at p. 252.)

Courts therefore interpret criminal statutes to ensure they do not condemn morally blameless actions, even where the statute by its terms does not expressly suggest this reading. (See, e.g., *Elonis*, *supra*, 135 S.Ct. at p. 2009.)

We thus must presume the Legislature did not intend to write criminal laws to ensnare the innocent.

To state it in the positive, we must presume legislators in America enact criminal statutes that confine the statute's scope to morally blameworthy actions. No one thinks ordinary tailors, carpenters, or grocery clerks are morally blameworthy because they put some pointed thing in a pocket.

This presumption explains the judicial practice, at both the federal and the state level, of interpreting criminal statutes to confine their reach to morally culpable actions.

This practice is federal. (E.g., *Elonis*, *supra*, 135 S.Ct. at pp. 2009–2012; *United States v. X-Citement Video, Inc.* (1994) 513 U.S. 64, 67–78; *Staples v. United States* (1994) 511 U.S. 600,

5

604–620; *Ratzlaf v. United States* (1994) 510 U.S. 135, 138–149; *Liparota v. United States* (1985) 471 U.S. 419, 424–426.)

The practice is equally at home in California state jurisprudence. The Penal Code laid the foundation from its earliest days. (Pen. Code, § 20 ["In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence."].)

Our Supreme Court interprets criminal statutes to include a guilty knowledge requirement even when the statutes are entirely silent on the topic. (E.g., *Stark v. Superior Court* (2011) 52 Cal.4th 368, 377, 393; see *id.* at pp. 390–403; *People v. Salas* (2006) 37 Cal.4th 967, 979*; In re Jorge M.* (2000) 23 Cal.4th 866, 887; *People v. Coria* (1999) 21 Cal.4th 868, 878–880; *People v. Simon* (1995) 9 Cal.4th 493, 519–522.)

This approach to statutory interpretation expresses a conception of justice that is not simply federal nor Californian in origin. This conception of justice is *American* in character. Nobody in this country—including our elected lawmakers—wants legislatures writing criminal laws that can imprison blameless people. Other countries have done that, but that is contrary to our shared ideals. Because our lawmakers share this view, this presumption effectuates legislative intent.

So how do we square this fundamental concern about the properly delimited scope of the criminal law with the seemingly unbounded statutory language in this case?

### III

The *Grubb* and *Mitchell* cases suggest a statutory interpretation that may solve the problem and that therefore deserves emphasis. (See *People v. Grubb* (1965) 63 Cal.2d 614,

6

621, fn. 9 (*Grubb*); *People v. Mitchell* (2012) 209 Cal.App.4th 1364, 1372 (*Mitchell*).)

Of these two cases, only the *Mitchell* decision was a dirk-or-dagger case. I'll come to it shortly. Let's start with the older case, the one from the Supreme Court.

*Grubb* dealt with a different but similarly expansive statute that outlawed a weapon "commonly known as a billy." (*Grubb*, *supra*, 63 Cal.2d at p. 615; see Pen. Code, § 22210.) Justice Tobriner—one of the giants in California's judicial pantheon—wrote that "a small baseball bat" counted as an illegal billy. (*Grubb*, at pp. 615–621 & fn. 9.) Grubb's "possession of the altered baseball bat, taped at the smaller end, heavier at the unbroken end, carried about in the car, obviously usable as a 'billy,' clearly not transported for the purpose of playing baseball, violates the statute." (*Id*. at p. 621.) Buried in footnote 9, the *Grubb* decision noted defendants may justify their "possession of an instrument found under suspicious circumstances by proof of [their] intent to use it in accordance with its ordinary legitimate design." (*Id*. at p. 621, fn. 9.)

Let's review that, just to be clear.

The statute outlawed possession of " 'any instrument or weapon of the kind commonly known as a blackjack, slungshot, *billy*, sandclub, sandbag, sawed-off shotgun, or metal knuckles . . . .' " (*Grubb*, *supra*, 63 Cal.2d at p. 615, italics added.) The court held a baseball bat qualified as a "billy"—at least a bat that was small and altered to serve as a weapon. (*Id*. at p. 621.) But Little Leaguers and other innocents had nothing to fear because the high court simultaneously interpreted the statute to allow a *defense* that the defendant intended to use the

baseball bat "in accordance with its ordinary legitimate design." (*Id*. at p. 621, fn. 9.)

Three features of *Grubb*'s holding are notable.

First, the words of the statute said nothing about that defense. But our Supreme Court was entirely comfortable interpreting the statute to create it. The goal was to exempt "innocent usage of the proscribed instrument" from the statute's reach. (*Grubb*, *supra*, 63 Cal.2d at p. 622.) In other words, the *Grubb* court presumed legislators intended for this criminal statute to reach only morally blameworthy conduct. Part II of this concurrence showed how completely conventional this premise is in American law.

Second, is the Supreme Court really sure this is exactly right? The approach that "common things are illegal but you may defend by showing you are innocent" may clash with more recent Supreme Court notions about the burden of proof in criminal law. But I leave this latent uncertainty for a case where the parties have briefed it.

Third, *Grubb* is valid law. The Supreme Court in *Rubalcava*, *supra*, 23 Cal.4th at pages 329 and 333 cited *Grubb* approvingly, including *Grubb*'s footnote 9.

This defense from the *Grubb* case is vital because it provides a solution to the problem of statutory overbreadth that today's decision might otherwise exacerbate.

Now I turn to the other decision: *Mitchell*.

The *Mitchell* decision took the defense from *Grubb's* bat-and-billy context and applied it to dirk-and-dagger law. (*Mitchell*, *supra*, 209 Cal.App.4th at p. 1372.) Defendant Mitchell was carrying an 11-inch knife under his sweatshirt. Why? Mitchell told the jury it was because he was going fishing that

day.  (*Id*. at pp. 1369–1370.)  The jury apparently rejected this defense as a fish story of another kind, perhaps because Mitchell told security officers something different:  "that he carried the knife for self-defense."  (*Id*. at p. 1369.)  Also, Mitchell had no fishing tackle with him:  just the 11-inch knife.  (*Id*. at p. 1370.)  Although the jury did not believe Mitchell, the *Mitchell* court validated his statutory right to show his mental state was not blameworthy.

Hester likewise failed to convince the fact finder this statutory defense applied.  His lawyer argued Hester's possession was innocuous, but the judge in this bench trial reached the opposite conclusion:  "obviously I do believe he's the person who cut the victim."  Using a box cutter to cut another person is not in accordance with its ordinary legitimate design.

The CALCRIM instruction No. 2501 ought to be explicit about directing trial lawyers and trial judges to this important defense from *Grubb* and *Mitchell*.  This defense is what insulates morally innocent people from the statute's expansive scope.

The CALCRIM Committee thus should consider revising CALCRIM No. 2501.  That instruction currently has this inadequate provision:

"<*Give only if object may have innocent uses*.>  [When deciding whether the defendant knew the object (was an explosive/could be used as a stabbing weapon), consider all the surrounding circumstances, including the time and place of possession.  Consider also (the destination of the defendant[,]/ the alteration of the object from standard form[,]) and other facts, if any.]"

This provision is noble but unsatisfactory.  The provision is noble because it strives to limit the statute and thus to prevent it

from ensnaring innocent people. The provision is unsatisfactory because it fails in its mission. If asked "do you know your box cutter could be used as a stabbing weapon?", an honest and morally innocent grocery clerk would truthfully and forthrightly say "yes." The clerk would say "yes" because *anything* with a sharp point can be used as a stabbing weapon, and everyone with any wits knows it. As the trial court in this case rightly put it, one can "easily infer that the defendant [Hester] knows its nature," referring to Hester's knowledge that a box cutter readily could be used as a stabbing weapon.

This unsatisfactory language in CALCRIM No. 2501 should be dropped or de-emphasized in favor of the important statutory defense from *Grubb* and *Mitchell*.

Thus I join today's result, but only with some uncertainty. California's legal conversation about stabbing weapons has been going on for a century. Today's words should not be the last.


WILEY, J.


10